## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| F & H ACQUISITION CORP., et al.,[1] | Case No. 13-13220 (____) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JAMES ZIELKE IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Zielke, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer and President of F & H Acquisition Corp., a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession ("F&H," and collectively, with all of the other above-captioned debtors and debtors in possession, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), F&H and 41 of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  F & H Acquisition Corp. (2666); 505 Entertainment, Ltd. (4594); Alabama Fox & Hound, Inc. (5894); Bryant Beverage Corporation (0639); Champps Entertainment, Inc. (0491); Champps Entertainment of Texas, Inc. (7242); Champps of Maryland (1010); Champps Operating Corporation (5130); Downtown Beverage Corp. (3943); F & H of Iowa, Inc. (2434); F & H of Kennesaw, Inc. (5997); F & H Restaurant Corp. (8349); F & H Restaurant of Georgia, Inc. (2200); F & H Restaurant of Texas, Inc. (9871); Fox & Hound of Arizona, Inc. (3585); Fox & Hound of Colorado, Inc. (7166); Fox & Hound of Illinois, Inc. (3003); Fox & Hound of Indiana, Inc. (5676); Fox & Hound of Kansas, Inc. (7699); Fox & Hound of Kentucky, Inc. (0777); Fox & Hound of Littleton, Inc. (2894); Fox & Hound of Louisiana, Inc. (0477); Fox & Hound of Maryland, Inc. (7608); Fox & Hound of Nebraska, Inc. (5786); Fox & Hound of New Jersey, Inc. (0951); Fox & Hound of New Mexico, Inc. (5620); Fox & Hound of Ohio, Inc. (3963); Fox & Hound of Oklahoma, Inc. (2928); Fox & Hound of Texas, Inc. (0979); Fox & Hound Restaurant Group (6614); Fox & Hound, Inc. (9035); Fox & Hound II, Inc. (9540); Fuqua Beverage Corp. (4906); Jackson Beverage Corporation (3948); N. Collins Entertainment, Ltd. (4596); Raider Beverage Corporation (4993); Rocket Beverage Corporation (9829); Shenandoah Beverage Corporation (8087); Tent Finance, Inc. (5335); Tent Restaurant Operations, Inc. (5556); Willowbrook Beverage Corp. (1601); Winston-Salem Fox & Hound, Inc. (8319).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1551 N. Waterfront Pkwy, Suite 310, Wichita, KS 67206.

101 et seq. (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.     I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" applications and motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

4.     F&H is a leading operator of sports bar and casual family-dining restaurants under two well-recognized concepts, Fox & Hound and Champps.  Prior to the Petition Date, the Debtors' operations encompassed approximately 101 restaurants located in 27 states, and employed approximately 6,000 employees, consisting of approximately 5,500 hourly employees and 500 salaried employees.

---

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

01:14595197.1

5.      As discussed in further detail below, in the years and months leading up to the Petition Date, the significant U.S. economic downturn hit the restaurant and casual dining industry hard, including the F&H business.  As unemployment levels skyrocketed, discretionary spending by historically-loyal customers and other consumers dropped, leading to reduced consumer traffic and sales.  Within the restaurant industry, the mid-scale sector - which encompasses the Debtors' restaurant business - suffered deep top line sale declines.  The Debtors' sales decreased by approximately 9 percent over the two years leading to the Petition Date.  The Debtors have also experienced significant inflation in commodity prices, energy prices and labor costs.  The Debtors introduced new advertising campaigns, marketing, menu initiatives and cost-cutting programs to mitigate these effects on their business; however, the Debtors were not immune to the effects of the economy and rising commodity prices, and restaurant sales, and overall profitability and liquidity, suffered significantly.

6.      As the Debtors' liquidity has suffered, the Debtors have struggled to meet their debt service obligations.  Prior to the Petition Date, the Debtors were required under the Debtors' prepetition secured credit facilities to maintain certain levels of EBITDA.  In the months leading up to the Petition Date, the Debtors failed to meet these EBITDA targets, resulting in a default under the prepetition credit agreements; however, the Debtors were able to successfully negotiate a forbearance agreement with their secured lenders.  The forbearance agreement, however, is subject to periodic testing and payments, pursuant to which the Debtors defaulted.

7.      In consultation with their professional advisors and after careful examination by the Debtors' board of directors, the Debtors determined that chapter 11 would provide the necessary tools to preserve asset value, accomplish a meaningful operational restructuring, and run a streamlined sale process for substantially all of the Debtors' assets.  Through these chapter

01:14595197.1

11 cases, the Debtors intend to implement an efficient public sale process to preserve their going-concern operations and maximize the value of their assets for the benefit of their creditors and estates.

## I.    General Background.

### A.    Debtors' Businesses and Overview.

8.    F&H is a Delaware corporation, headquartered in Wichita, Kansas, and is a leading operator of social destination casual dining restaurants.  The Debtors' portfolio of well-known concepts includes Fox & Hound, Bailey's Sports Grille and Champps.  The Debtors' uniquely positioned concepts offer customers an exciting venue for socializing, eating, drinking and watching events at an exceptional value.

9.    While the Debtors' restaurant concepts have distinct identities in the marketplace, they have a common cultural and operational support infrastructure in order to maximize efficiencies and consistency of operations and the guest experience.  Through the year ending December 2012, the Debtors generated revenues of $297.6 million and adjusted EBITDA of $25 million.   Through September 2013, the Debtors had revenues of $218.8 million, which represented a 5% overall reduction over the comparable period in the prior year.

### (i)    Fox and Hound Restaurants.

10.    F&H has two primary concepts – Fox & Hound and Champps.  Within Fox & Hound, the Debtors operate under two brands – Fox & Hound and Bailey's Sports Grille.

11.    Founded in Arlington, Texas in 1994, Fox & Hound has been a pioneer in the neighborhood sports tavern segment in the U.S.  Fox & Hound has created raving fans through warm and genuine hospitality, cold beer and great bar food.   The concept has become a neighborhood gathering spot by providing a comfortable, familiar place to unwind with friends, colleagues, or family and have a genuinely good time.   Fox & Hound offers its guests an

energetic and social atmosphere with state-of-the-art Audio Visual ("AV") entertainment, superior customer service, multiple billiards tables and other skill games, and a high-quality menu that includes shareable appetizers as well as entrée selections.  The Debtors currently operate 50 Fox & Hound restaurants in 24 states, achieving success in a wide variety of geographic and demographic markets and in both major cities as well as secondary markets.

12.     Bailey's Sports Grille was founded in Charlotte, North Carolina in 1989.  While Bailey's operates under a separate name from Fox & Hound, the two concepts share a common brand positioning, menu, design and operational principles.  The Debtors currently operate 16 Bailey's restaurants in seven states.

13.     In early 2013, Fox & Hound underwent an extensive operational review and market positioning analysis, which resulted in a renewed emphasis on the brands' core DNA, which now emphasizes:  (i) "Beer Experts" - Fox & Hound offers over 100 local, draft and craft beer selections with over 30 taps in most locations; (ii) "Great Bar Food" - Fox & Hound focuses on sharable appetizers, interesting handheld sandwiches and burgers, creative flatbreads, fresh salads and more; and (iii) "Sports and Entertainment" - Fox & Hound prides itself on being the best neighborhood spot to watch your favorite sporting event, gather with friends for a game of pool or other special events.

(ii)     <u>Champps</u>

14.     Champps' first location opened in St. Paul, Minnesota in 1986.  The concept has since grown to 35 company-owned and 11 franchised locations in 17 states.

15.     Champps is an energetic, premium sports bar and grill with an extensive menu of freshly prepared items providing guests with a comfortable atmosphere that promotes social interaction.  The concept is the "go-to" establishment for enjoying local and national sporting events, with a more upscale environment than typical sports-themed restaurants and bars.

16.     Champps' brand DNA is focused on being a premium sports bar and grill destination that offers a seat for every occasion, freshly prepared items in the "from scratch" kitchen and an extensive selection of local craft beer.

(iii)     Franchising.

17.     Debtor Champps Entertainment, Inc. franchises 11 Champps restaurants under franchise agreements.  Franchisees are offered the right to operate a Champps restaurant for an upfront fee.  Franchised locations are operated under strict guidelines to present a unified brand image.  Franchising offers stable cash flows from the collection of royalties and product purchases, accounting for a significant percentage of the Debtors' EBITDA.  Franchising operations generated $0.3 million in revenue (0.1 percent of total revenues) in the first ten months of 2013 with Adjusted EBITDA of $0.3 million.

B.     The Debtors' Prepetition Organizational Structure.

18.     In February 2006, Fox & Hound was acquired by Newcastle Partners, LP and Steel Partners LLC through F&H Acquisition Corp.  F&H is a privately held Delaware corporation.  In October 2007, F&H acquired Champps, combining the two similar, yet distinct concepts under one parent company.  The chart attached hereto as **Exhibit A** depicts the Debtors' prepetition organizational structure.

C.     The Debtors' Prepetition Capital Structure.

19.     As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $119 million (excluding approximately $2.3 million in issued and unfunded letters of credit), consisting primarily of approximately (a) $68.4 million in secured debt under a first lien senior secured credit facility, (b) $39.8 million under a second lien secured credit facility, and (c) $11.2 million owed to vendors, landlords and other unsecured creditors.

(i)    The Prepetition Credit Agreements

20.    As of the Petition Date, F&H and its co-borrower affiliates were parties to that certain $80,000,000 Credit Agreement dated as of March 19, 2012, by and among F&H and each of its Debtor affiliates as Borrowers, and General Electric Capital Corporation ("the First Lien Agent") as Lender and as Agent on behalf of itself and other Lenders thereto (as amended from time to time, the "First Lien Credit Agreement").  The First Lien Credit Agreement is secured by substantially all of the Debtors' assets.  As of the Petition Date, approximately $68.4 million is outstanding under the First Lien Credit Agreement, excluding approximately $2.3 million in issued and unfunded letters of credit.

21.    In addition, as of the Petition Date, F&H and its co-borrower affiliates were parties to that certain $37,100,000 Credit Agreement dated as of March 19, 2012 by and among F&H and each of its Debtor affiliates as Borrowers, and Cerberus Business Finance, LLC (the "Second Lien Agent," and collectively with the First Lien Agent, the "Agents") as Lender and as Agent on behalf of itself and other Lenders thereto (as amended from time to time, the "Second Lien Credit Agreement," and collectively with the First Lien Credit Agreement, the "Credit Agreements").  The Second Lien Credit Agreement is secured by substantially all of the Debtors' assets, junior in priority only to the liens granted pursuant to the First Lien Credit Agreement. As of the Petition Date, approximately $39.8 million is outstanding under the Second Lien Credit Agreement (inclusive of approximately $2.5 million of payment in kind interest).

22.    An intercreditor agreement exists as between the first and second lien lenders.

(ii)    The November Forbearance Agreements

23.    In the fall of 2012, it became apparent that the Debtors would have difficulty performing certain of their obligations under the Credit Agreements.  Specifically, the Debtors were unable to make a scheduled October 1, 2012 payment of $1.45 million due on the First Lien

Credit Agreement.  Also, the Debtors defaulted under their Credit Agreements by not paying down their first lien indebtedness the amount in excess of their maximum allowable senior leverage.   These defaults resulted in late November, 2012 forbearance agreements and amendments to both Credit Agreements.  Key to obtaining the forbearance agreements, however, was the understanding that the Debtors would proceed with their pending operational improvement plans.  These plans included:  (i) hiring a new chief executive officer of F&H; (ii) implementing certain performance improvement initiatives; (iii) evaluating the implementation of a four store Chicago pilot program repositioning of the Fox & Hound concept; and (iv) the implementation of a remodel program repositioning the Fox & Hound concept (ten locations having been completed to date).

24.    The amendments to the Credit Agreements and forbearance agreements also required the Debtors to undergo a sale and refinancing process.  Thus, in February 2013, the Debtors engaged Imperial Capital ("Imperial") to evaluate strategic alternatives, including a potential sale or recapitalization of the Debtors.  As explained below, since March 2013, Imperial has conducted an extensive process that has reached out to approximately 100 potential buyers/investors and over 60 lenders.

(iii)    Unsecured Debt

25.    The Debtors have approximately $11.2 million in unsecured debt.[3]  Most of this amount constitutes approximately $6.1 million of trade debt owed to hundreds of vendors and accruals to landlords of approximately $3.8 million.

## II.    Events Leading to these Chapter 11 Cases.

26.    Over the course of the last few years, a series of factors has contributed to the Debtors' need to file these chapter 11 cases, as described below.  The Debtors' top line sales

---

[3] This amount excludes claims that may accrue to landlords on account of lease rejections or terminations.

decreased, while their bottom line profitability declined as a result of an increase in commodity costs, energy costs, and labor costs. These factors placed significant strain on the Debtors' business, liquidity, and ability to satisfy covenants under the Credit Agreements.

A.    Declining Restaurant Sales

27.    Prior to the commencement of these chapter 11 cases, the Debtors' operations and financial performance were adversely affected by the downturn in the economy, the highly competitive nature of the casual family dining sector and poor sales results. The recession has been a primary factor in the decline in the Debtors' sales, as consumers prioritized the savings of dining at home over eating-out. With overall unemployment rates at historically high levels, discretionary income for customers has been severely constrained, directly correlating to depressed restaurant sales and reduced or eliminated customer traffic. In the first eleven months of 2013, the Debtors reported a 3.1 percent decline in comparable store sales compared to 2012. These decreases were driven primarily by a decline in consumer traffic.

28.    Throughout the economic recession and leading to the Petition Date, the Debtors' management has focused on introducing new and strategic initiatives to combat the fall in consumer spending and improve guest traffic. Such initiatives include, amongst others, a remodeling program, new menu initiatives and quality improvements, enhancing marketing programs, including expanding the usage of loyalty programs and social media platforms.

B.    Rise In Commodity and Food Prices

29.    In addition to declining sales, the cost of certain commodities and key food items, principally cheese and meats, had an adverse impact on the Debtors' operating results for several years. The Debtors have implemented strategies to mitigate or partially offset the impact of higher commodity prices, including price increases, cost reduction actions, work force reductions, wage freezes, and reductions in other employee benefits; however, due to the

magnitude and duration of the increased food and commodity costs, these strategies offset only a portion of the overall adverse effect of commodity prices on the Debtors' operating profits.

      C.    <u>Turnaround Efforts</u>

      30.    In the fourth quarter of 2012, the Debtors began to actively search for a new CEO and in January 2013, the Debtors hired Marc Buehler, a seasoned restaurant executive with experience executing turnaround and growth plans at several leading casual and full service dining chains.

      31.    Since joining in January, Mr. Buehler embarked on a thorough review of both the Fox & Hound and Champps concepts. Following his review, the Debtors implemented a comprehensive strategic plan to improve the guest experience, enhance the relevance of the brands and competitive positioning, grow same store sales, and stabilize and improve margins. Despite these efforts, the Debtors' business operations continued to experience declines in sales and defaults under the Credit Agreements.

      D.    <u>Lease Negotiations</u>

      32.    In connection with the prepetition efforts to restructure, the Debtors also engaged Hilco Real Estate LLC ("<u>Hilco</u>") in January 2013 to review its real estate portfolio and identify underperforming locations. Beginning in February 2013, Hilco began to reach out to landlords, particularly focused on the Champps portfolio, regarding potential lease concessions and potential closures. Hilco negotiated lease terms for several restaurant locations.

      E.    <u>DIP Negotiations</u>

      33.    Given the urgency to find an immediate comprehensive liquidity solution, including postpetition financing, the Debtors' management team, together with Imperial, have worked to address certain risks presented by a continued deterioration of the Debtors' liquidity position.

34.     Given the timing for a chapter 11 filing and the impending liquidity crisis, the Debtors' were not able to secure financing proposals from third parties that would provide the Debtors with sufficient liquidity to fund these chapter 11 cases, including on an unsecured or non-consensual priming basis or on a priority junior to that of the Agents.  Accordingly, the Debtors determined, in consultation with their advisors, including Imperial, that under the circumstances, including the Debtors' capital structure, liquidity position, the current debtor-in-possession financing market, and the results of recent conversations with a variety of stakeholders and other parties, including several potential candidates regarding debtor in possession financing, the DIP Facility is the best option available to the Debtors to provide them with sufficient liquidity to continue to operate their business operations and to conclude their restructuring/sale.

35.     Throughout the weeks leading up to the Petition Date, the Debtors and the First Lien Agent engaged in extensive good faith and arm's length negotiations with respect to the terms and conditions of the proposed postpetition financing.  The result of such good faith and arms' length negotiations was the execution of the DIP Facility, which the Debtors have submitted to the Court for approval.

F.     <u>The Proposed Sale of the Debtors' Assets.</u>

36.     The Debtors engaged Imperial in February 2013 to evaluate strategic alternatives for the Debtors, including a potential sale or recapitalization of the Debtors.  Imperial prepared a "teaser" and a detailed confidential information memorandum and set up an electronic data room for interested parties to conduct due diligence.  In connection with such efforts, Imperial contacted 164 parties, including banks and non-institutional investors, resulting in the Debtors' entry into approximately 80 non-disclosure agreements.  The Debtors received eight indications

of interest from potential purchasers. The Debtors conducted five meetings with potential purchasers.

37.    In connection with this process, Imperial had a second round of discussions with seven parties which had previously expressed interest. None of those discussions produced a stalking horse bidder. Then, in October 2013, Imperial contacted nine new possible buyers and 22 previously-contacted buyers with the objective of finding a qualified stalking horse bidder. Ultimately, notwithstanding extensive negotiations with the Agents, the Debtors have not come to terms on a stalking horse agreement as of the Petition Date.

38.    To ensure the Debtors receive the highest and best offer for the sale of substantially all of their assets, the Debtors, together with Imperial, will continue the marketing process for the sale of the Debtors' assets. To facilitate an orderly sale process, the First Lien Agent has agreed to fund the Debtors' postpetition financing needs, through the DIP Facility. The Debtors are seeking the Court's approval of the DIP Facility which, if approved, will, among other things, provide the Debtors with (i) a postpetition revolving credit facility in a principal amount not to exceed approximately $3.5 million on an interim basis and approximately $9.6 million on a final basis, and (ii) a postpetition letter of credit facility comprised of the Prepetition Letters of Credit, including any renewals thereof, in an aggregate face amount not to exceed $2.269 million, plus $1 million in postpetition letters of credit (to be applied against the postpetition revolving facility).

39.    The Debtors believe that an open and transparent auction and sale process will determine the highest and best bid and maximize value for the Debtors' assets. The primary purpose of the sale process will be to provide for a sale of substantially all of the Debtors' assets and operations as a going concern, to the party that submits the highest and best offer in

accordance with the proposed bid procedures that the Debtors will file with the Court in accordance with the timeline provided for in the DIP Facility.

40.    **Evidentiary Support for First Day Motions**[4]

41.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief, with appropriate reliance on other members of the Debtors' management and the Debtors' professional advisors.

A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion").

42.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of F&H Acquisition Corp., and also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than F&H Acquisition Corp., to reflect the joint administration of these chapter 11 cases.

43.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will

---

[4] Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

arise in these chapter 11 cases will jointly affect F&H Acquisition Corp. and each of its affiliates that also have contemporaneously filed chapter 11 cases.  Among other things, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

44.      Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

B. <u>Application of the Debtors for an Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent to the Debtors, *Nunc Pro Tunc* to the Petition Date (the "Epiq Retention Application").</u>

45.      The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Local Rule 2002-1(f), authorizing the retention and appointment of Epiq as claims and noticing agent in connection with these chapter 11 cases, in accordance with the Retention Agreement.  I believe that the relief requested in the Epiq Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ease the administrative burden on the Clerk in connection with these chapter 11 cases.  In addition, I have been advised by counsel that Epiq's retention is required by the Local Rules in light of the anticipated number of creditors in these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Epiq Retention Application should be approved.

C. <u>Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services; (II) Deeming Utility Providers Adequately Assured of Payment; and (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment (the "Utilities Motion").</u>

46.      The Debtors request the entry of interim and final orders, among other things:  (a) determining that the Utility Providers have been provided with adequate assurance of payment

within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing any Utility Providers' requests for additional adequate assurance; and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order.  In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by several Utility Providers.  Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, to the success of their chapter 11 efforts.  Indeed, any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, thereby seriously jeopardizing the Debtors' chapter 11 efforts and, ultimately, estate value and creditor recoveries.  It is, therefore, critical that Utility Services continue uninterrupted during these chapter 11 cases.

47.     As of the Petition Date, the Debtors believe they are current on their utility payments.  I believe and am advised that the Proposed Adequate Assurance and Additional Adequate Assurance Procedures are necessary in these chapter 11 cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding - on or after the 30th day following the Petition Date - that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of Utility Service could shut down operations, and any significant disruption of operations could jeopardize the success of these chapter 11 cases.

48.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

D.  <u>Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b), 507(a)(8) and 541 of the Bankruptcy Code (I) Authorizing Payment of Certain Prepetition Taxes and Fees, and (II) Authorizing and Directing Financial Institutions to Process and Cash Related Checks and Transfers (the "Taxes and Fees Motion").</u>

49.     The Debtors request authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date.  In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay.  In addition, certain of the Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes and Fees, that undoubtedly would distract those individuals from their duties related to the Debtors' prosecution of these chapter 11 cases.

50.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

E. Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act, (B) of Other Lien Claimants, and (C) Arising Under Section 503(b) (9) of the Bankruptcy Code and (II) Granting Certain Related Relief (the "Lienholders Motion").

51.     The Debtors request the authority to (a) pay prepetition claims arising, or of the type, under the Perishable Agricultural Commodities Act of 1930, (b) pay prepetition claims of certain other lienholders, and (c) satisfy claims subject to section 503(b)(9) of the Bankruptcy Code.

52.     The Debtors rely on several sellers which supply the Debtors with fruits and vegetables protected by PACA and may be eligible to assert PACA Claims against the Debtors, in priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases. The Debtors also do business with a number of vendors who could potentially assert mechanic's liens, materialman's liens and other similar liens against the Debtors.  Finally, the Debtors have received certain goods within the twenty-day period prior to the Petition Date that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

53.     Without the relief granted in the Lienholders Motion, the Vendors may refuse to supply to the Debtors essential food, products, and supplies, while certain servicers and repairmen may assert liens against the Debtors and their property for amounts the Debtors owe to those Vendors.  Failure to receive these goods and services could cause serious disruptions to the continuous and timely flow of food, product, and supplies that are essential to the Debtors' business.  Paying the prepetition obligations owed to the Vendor in the ordinary course of business will thus benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  I believe that the relief requested in the Lienholders Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will provide the Debtors' business operations a smooth transition into

01:14595197.1

chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lienholders Motion should be approved.

  F. <u>Debtors' Motion Pursuant to Sections 105(a), 363(c), 503(b)(1), 1107(a) and 1108 of the Bankruptcy Code for Authorization to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business (the "Customer Programs Motion").</u>

  54. The Debtors request the authority to maintain and administer their Customer Programs, and honor prepetition obligations related thereto, in the ordinary course of business and in a manner consistent with past practice.

  55. To maintain the loyalty and goodwill of their customers, in the ordinary course of business, the Debtors implemented the Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure that the Debtors remain competitive within the industry in which they operate.  The Debtors' ability to honor their Customer Programs and related obligations in the ordinary course of business is necessary to retain their customer base and reputation for quality.  The Debtors believe that the relief requested will pay dividends with respect to the success of these chapter 11 cases, especially at this critical time following the filing of the cases.

  56. I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

01:14595197.1

G. Debtors' Motion for an Order (A) Authorizing (I) Continued Use of their Existing Cash Management System, and (II) the Use of Existing Bank Accounts and Business Forms, (B) Authorizing Payments of Prepetition Costs and Fees Associated with Customer Credit and Debit Card Transactions, (C) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis, and (D) Granting Related Relief (the "Cash Management Motion").

57.     The Debtors request the authority to:  (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

58.     In addition, the Debtors further request that the Court authorize the Banks to:  (a) continue to maintain, service, and administer the Bank Accounts; and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

59.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts,

revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

60.    The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

61.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

H.    <u>Motion of the Debtors for Entry of an Order: (I) Authorizing the Debtors to (A) Pay Wages, Salaries, and Other Compensation, (B) Remit Applicable Withholding Obligations, (C) Maintain Employee Benefits, (D) Pay Reimbursable Employee Business Expenses, and (E) Make All Payments to Third Parties Incident to the Foregoing; and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing (the "Wages and Benefits Motion").</u>

62.    The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employees and the Benefits.

01:14595197.1

63.     As of the Petition Date, the Debtors employ approximately 6,000 employees, of which approximately 5,500 are paid on an hourly basis and approximately 500 are paid on a salaried basis.  Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due and owing.

64.     The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors.  In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

65.     The Debtors also seek to schedule a non-emergency hearing regarding approval of continuation of their Store General Manager Bonus Program.   Under this program, approximately sixteen people employed by the Debtors as General Managers or District Operators of one or more Champps restaurants are parties to certain bonus agreements.  None of these Employees are insiders of the Debtors.  The Employees that are a party to these agreements obtained participating interests in the operating cash flow of the Debtors' restaurants.  The

amounts due under these agreements and amendments thereto have, in most cases, been earned and liquidated. Generally, these amounts are due in three installments for each of the applicable Employees on various dates between 2013 and 2016. The Debtors will seek the ability to pay no more than $150,000 in the aggregate on account of the Store General Manager Bonus Program, which is the Debtors' estimate of aggregate amounts which will come due to four Employees under the Store General Manager Bonus Program over the next 120 days.

66.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

I.    Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Motion").

67.    Among other things, the Debtors request the authority to (a) obtain postpetition financing on a senior-secured, super-priority basis, (b) grant super-priority liens and claims, (c) use Cash Collateral and provide adequate protection in connection therewith, and (d) roll-up certain prepetition secured debt upon entry of a final order with respect to the DIP Motion. The Debtors need financing to fund the administration of these chapter 11 cases and implement the efficient, public process through which the Debtors intend to sell their businesses as a going concern.

68.    As previously set forth in this First Day Declaration, without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital

necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies through the consummation of any sale of the Debtors' businesses.  The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers.  In sum, approval of the DIP Facility is necessary to avoid erosion of value and to accomplish a seamless transition into chapter 11 and, ultimately, to new ownership through a sale process.

69.    I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

J.    Debtors' Motion Pursuant to Sections 105(a), 365(a) and 554(a) of the Bankruptcy Code for an Order Authorizing the Debtors (I) to Reject Certain Unexpired Leases of Nonresidential Real Property, *Nunc Pro Tunc* to the Petition Date and (II) to Abandon Any Property That Remains on the Premises Covered by the Leases (the "Lease Rejection Motion").

70.    By the Lease Rejection Motion, the Debtors request the entry of an order authorizing the rejection of the Leases, and the abandonment of certain related personal property, each effective as of the Petition Date.  The Debtors have ceased operations at approximately 24 restaurant locations as part of the Debtors' prepetition and ongoing restructuring effort.  In an effort to maximize the value of their estates and reduce their administrative costs in these chapter 11 cases, the Debtors have reviewed their overall operations and have determined, in their business judgment, that the Leases are burdensome and provide no economic value to their

estates.  Moreover, the Debtors, in the exercise of their business judgment, have determined that the rejected Leases are unprofitable and are not necessary for the Debtors' restructuring efforts.

71.    To eliminate ongoing obligations under the Leases for these locations and minimize claims against the Debtors' estates arising from the Leases, the Debtors seek to reject the Leases *nunc pro tunc* to the Petition Date.  In addition, although the Debtors believe that they have already properly vacated the Premises, and that no further estate property remains at those locations, in the event that personal property of *de minimis* value remains at any of the locations, including, but not limited to, furniture, fixtures and equipment, the Debtors request the Court's approval of the Debtors' abandonment of that Personal Property *nunc pro tunc* to the Petition Date, pursuant to section 554(a) of the Bankruptcy Code.

72.    In light of the importance of the Debtors' ability to reject the Leases *nunc pro tunc* to the Petition Date, the Debtors have filed the Lease Rejection Motion on the Petition Date and have highlighted the relief requested in this Declaration.  The Debtors acknowledge that the relief requested requires due and proper notice and will not be granted at the "first day" hearing. Accordingly, the Debtors will provide notice of the Lease Rejection Motion and the corresponding hearing date in accordance with the Bankruptcy Rules and the Local Rules.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: December 15, 2013
       Wilmington, Delaware

                                  James Zielke
                                  Chief Financial Officer and President
                                  F&H Acquisition Corp.

# **EXHIBIT A**

