## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F & H ACQUISITION CORP., et al.,[1] | Case No. 13-13220 (____) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS (A) ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT, (B) OF OTHER LIEN CLAIMANTS, AND (C) ARISING UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE AND (II) GRANTING CERTAIN RELATED RELIEF

F & H Acquisition Corp. and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors") hereby file this motion (this "Motion") for the entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay, in the ordinary course of business as such claims come due:  (a) all prepetition claims arising under the Perishable Agricultural Commodities Act of 1930 (as amended, modified or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: F & H Acquisition Corp. (2666); 505 Entertainment, Ltd. (4594); Alabama Fox & Hound, Inc. (5894); Bryant Beverage Corporation (0639); Champps Entertainment, Inc. (0491); Champps Entertainment of Texas, Inc. (7242); Champps of Maryland (1010); Champps Operating Corporation (5130); Downtown Beverage Corp. (3943); F & H of Iowa, Inc. (2434); F & H of Kennesaw, Inc. (5997); F & H Restaurant Corp. (8349); F & H Restaurant of Georgia, Inc. (2200); F & H Restaurant of Texas, Inc. (9871); Fox & Hound of Arizona, Inc. (3585); Fox & Hound of Colorado, Inc. (7166); Fox & Hound of Illinois, Inc. (3003); Fox & Hound of Indiana, Inc. (5676); Fox & Hound of Kansas, Inc. (7699); Fox & Hound of Kentucky, Inc. (0777); Fox & Hound of Littleton, Inc. (2894); Fox & Hound of Louisiana, Inc. (0477); Fox & Hound of Maryland, Inc. (7608); Fox & Hound of Nebraska, Inc. (5786); Fox & Hound of New Jersey, Inc. (0951); Fox & Hound of New Mexico, Inc. (5620); Fox & Hound of Ohio, Inc. (3963); Fox & Hound of Oklahoma, Inc. (2928); Fox & Hound of Texas, Inc. (0979); Fox & Hound Restaurant Group (6614); Fox & Hound, Inc. (9035); Fox & Hound II, Inc. (9540); Fuqua Beverage Corp. (4906); Jackson Beverage Corporation (3948); N. Collins Entertainment, Ltd. (4596); Raider Beverage Corporation (4993); Rocket Beverage Corporation (9829); Shenandoah Beverage Corporation (8087); Tent Finance, Inc. (5335); Tent Restaurant Operations, Inc. (5556); Willowbrook Beverage Corp. (1601); Winston-Salem Fox & Hound, Inc. (8319).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1551 N. Waterfront Pkwy, Suite 310, Wichita, KS 67206).

supplemented from time to time, "PACA"), and any all state statutes of similar effect,[2] of PACA vendors (collectively, the "PACA Vendors," whose claims shall be identified herein collectively as the "PACA Claims"); (b) prepetition claims upon which a lien may arise as a result of a mechanic's lien, artisan's lien, materialman's lien or any similar lien (collectively, the "Lien Claimants," whose claims shall be identified herein collectively as the "Lien Claims"); and (c) all claims entitled to administrative priority under section 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") (collectively, the "Section 503(b)(9) Claimants," whose claims shall be identified herein collectively as the "Section 503(b)(9) Claims"); and (ii) authorizing the Debtors' banks and financial institutions (collectively, the "Banks") to receive, process, honor and pay all checks and electronic payment requests relating to the foregoing. In support of this Motion, the Debtors respectfully state as follows.

### Background

1.      As described in the Declaration of James Zielke in Support of First Day Motions (the "Zielke Declaration"), the Debtors are leading operators of sport-bar and family dining restaurants.  The Debtors' operations include the management of approximately 101 restaurants and oversight of 11 franchised restaurant locations, located in 27 states.   Of these 101 restaurants, the Debtors' operate 50 restaurants under the Fox & Hound brand name, 16 restaurants under the Bailey's Sports Grille brand name and 35 restaurants under the Champps brand name.  The Debtors employ approximately 6,000 hard working employees across the country.

---

[2] Some states have enacted statutes granting protection similar to that of PACA.  See, e.g., Minn. Stat. §§ 27.01 et seq.  Accordingly, the relief requested in the Motion with respect to PACA Vendors and PACA Claims is also requested with respect to the goods, claims and claimants under those state statues having an effect and purpose similar to PACA.

2.      In recent years, the restaurant industry, including the Debtors' businesses, has been hurt by the significant U.S. economic downturn and increased food costs.  New advertising campaigns, operational improvement initiatives and cost-cutting programs implemented by the Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly.  In late 2012, as the Debtors' liquidity position deteriorated, they struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition credit agreements, resulting in defaults with the Debtors' senior and junior lender groups.  Since February 2013 the Debtors have explored available strategic alternatives as part of their overall turnaround efforts.  After months of careful review, and after a diligent pre-petition process that sought investors, buyers and lenders, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most efficient way to best preserve the jobs of their employees and maximize a return for the Debtors, their estates, and all parties in interest.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of Bankruptcy Code in order to permit them to restructure their balance sheets and operations to restore profitability.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

**Jurisdiction and Venue**

4.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dates as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.       The statutory bases for the relief requested herein are sections 105(a), 363, 503(b)(9), 507(a)(2), 541, 1107(a) and 1108 of the Bankruptcy Code, and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Relief Requested**

6.       By this Motion, the Debtors seek entry of the Proposed Order authorizing, but not directing, the Debtors, in their sole discretion, to pay the PACA Claims, Lien Claims, and Section 503(b)(9) Claims (each, a "Claim," and collectively, the "Claims").

**The Claims**

7.       As described in detail below, various third parties may be able to assert liens against the Debtors' assets, including the PACA Vendors and Lien Claimants.  In addition, due to the nature of the Debtors' businesses, certain vendors may possess Section 503(b)(9) Claims. It is critical to the Debtors' business operations that the Debtors continue to receive goods and services, as applicable, from the PACA Vendors, the Lien Claimants and the Section 503(b)(9) Claimants (each, a "Vendor," and collectively, the "Vendors").  The Debtors believe that without the relief requested herein, many of the Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors' business operations and their efforts in connection with these chapter 11 cases.

A.    **PACA Claims**

8.    To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors seek authority, but not direction, in their sole discretion, to continue to pay in the ordinary course of business and consistent with their historical practices PACA Claims to those vendors who supply the Debtors with it fruits and vegetables.

9.    Congress enacted PACA to regulate the sale of "perishable agricultural commodities."  7 U.S.C. § 499a; *see Endico Potatoes, Inc. v. CIT Group/Factoring*, 67 F.3d 1063, 1067 (2d Cir. 1995).  Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and fresh vegetables of every kind and character" "whether or not frozen or packed in ice."  7 U.S.C. § 499a(b)(4).  PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (a "PACA Trust"), consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").  *See* 7 U.S.C. § 499e(c)(2).  Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets.  However, courts in this district and other districts have consistently held that PACA Trust Assets are not property of a debtor's estate.  *See In re CFP Liquidating Estate*, 405 B.R. 694 (Bankr. D. Del. May 21, 2009); *In re Long John Silver's Restaurants, Inc.*, 230 B.R. 29, 32 (Bankr. D. Del. 1999); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).

10.    PACA requires that certain procedural steps be taken by a seller of perishable agricultural commodities in order to preserve its rights as a trust beneficiary.  Specifically, a PACA Vendor must provide written notice (a "PACA Notice") to the purchaser of such goods and its intent to preserve the benefits of the PACA Trust.  *See In re HR. Hindle & Co.*, 149 B.R.

775, 785 (Bankr. E.D. Pa. 1993); *In re Richmond Produce Co.*, 112 B.R. 364 (Bankr. N.D. Cal. 1990).  Written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within 30 days after the time payment is due.  Beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate.  *See "R" Best Prod., Inc. v. 646 Corp.*, No. 00-CV-8536, 2002 WL 31453909, at *1 (S.D.N.Y. Oct. 31, 2002).  However, a PACA Vendor's failure to comply with the notice requirements renders its claim a general unsecured claim in a debtor's chapter 11 case.  *See In re HR. Hindle*, 149 B.R. at 786.

11.     PACA's application is limited to sales to commission merchants, brokers, and dealers.  7 U.S.C. § 499e(c).  "Dealer," as such term is defined in PACA, is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce."  7 U.S.C. § 499a(b).

12.     The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodit[ies]" under PACA.  As a result, insofar as those vendors abide by the notice requirements of PACA, such vendor will be eligible to assert PACA Claims granting them priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases.  Accordingly, payment of PACA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors.  To ensure that the supply of fresh produce continues unimpeded, it is imperative that the Debtors be

authorized to pay all prepetition and postpetition PACA Claims in the ordinary of business and consistent with their historical practices.

13.     As of the Petition Date, the Debtors estimate they owe holders of PACA Claims approximately $475,000 in the aggregate for PACA goods delivered prior to the Petition Date; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

14.     Any PACA Vendor who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority, against the Debtors, their property, their estates, and any PACA Trust Assets, but only to the extent that payment has been received by such PACA Vendor on account of its PACA Claim.

**B.    Lien Claims**

15.     In the ordinary course of business, the Debtors engage a number of mechanics and other service providers to repair, maintain, and improve the Debtors' store front and restaurant premises.  In addition, under certain state laws, the Debtors' are required to post surety bonds in favor of vendors to secure payment for products purchased.  The Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens, and materialman's liens, against the Debtors' property for amounts the Debtors owe to them.

16.     Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such mechanics' liens and similar liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).

01:14595263.1

17.     The Lien Claims related to maintenance activities constitute a significant portion of the estimated outstanding prepetition amounts owed to Lien Claimants.  If the Debtors are unable to pay these claims, they risk losing access to facilities and equipment that are critical to the continued operation of their businesses, which could immediately and irreparably harm their businesses to the detriment of all stakeholders.

18.     Accordingly, the Debtors seek authority, but not direction, in their sole discretion, to pay and discharge, on a case-by-case basis, Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property or equipment, regardless of whether such Lien Claimants have already perfected their interests.  However, as with the rest of the Claims, to the extent that the Debtors make any payments with respect to a Lien Claim, no such payment shall be deemed a waiver of the rights of the Debtors and their estates to challenge the extent, validity, perfection, or possible avoidance of such liens.

19.     The Debtors estimate that the Vendors may have as much as $300,000 in Lien Claims against the Debtors related to maintenance.  The Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.

## C.     Section 503(b)(9) Claims

20.     Certain vendors may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods, in the ordinary course of business, within the twenty-day period immediately prior to the Petition Date.  Because the Debtors must pay such claims in full to confirm a plan of reorganization, the payment of these Section 503(b)(9) Claims merely affects the timing of such payments, and not the amount. The Debtors seek authority, but not direction, in their sole discretion, to pay the Section 503(b)(9) Claims in the ordinary course of business to the extent necessary to preserve the going-concern value of the Debtors' chapter 11 estates.  However, as with the rest of the Claims, to the

01:14595263.1

extent that the Debtors make any payments with respect to such a claim, no such payment shall be deemed a waiver of the rights of the Debtors and their estates to contest the validity and amount of any such claim.

21.     The Debtors estimate approximately $2.7 million in Section 503(b)(9) Claims as of the Petition Date; the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.   Of this amount, the Debtor seeks authority, but not direction, to pay up to $1.6 million in the ordinary course.

22.     In sum, pursuant to this Motion, the Debtors are requesting authority, but not direction, from the Court to pay the Claims, subject to the following caps:

| | |
|---|---:|
| PACA Claims | $475,000 |
| Lien Claims | $300,000 |
| Section 503(b)(9) Claims | $1.6 million |

23.     Subject to the terms set forth below, the Debtors propose to condition the payment of the Claims on the agreement of individual Vendors to continue to provide goods and services, as applicable, to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed prior to the Petition Date (the "Historical Trade Terms"), unless this requirement is waived by the Debtors, in their sole discretion.

24.     In the event that any Vendor that has received payment for its Claim refuses to continue to provide goods and services, as applicable, on an uninterrupted basis, to the Debtors in accordance with (a) the terms and provisions of the Proposed Order, (b) Historical Trade Terms, or (c) such other terms agreed upon by the Debtors and such Vendor, the Debtors propose that, without further order of the Court and in their sole discretion, they be authorized to deem the payments made to any such Vendor to have been in payment of any then-outstanding postpetition claims of such Vendor.  If this situation arises, the previously paid Claims of the

01:14595263.1

Vendor shall be reinstated as Claims in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Vendor. To the extent that the payments made to the Vendor on account of the previously paid Claims exceed the post-petition amounts then owed to such Vendor, the Debtors and their estates reserve all rights to recover such payments.

<u>**Basis for Relief**</u>

**A.    Payment of the PACA Claims and Lien Claims is Warranted Under the Doctrine of Necessity**

25.    Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Just for Feet, Inc*., 242 B.R. 821, 824-25 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code.

26.    Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as

a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

27.    Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan.  *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

28.    In addition to the authority granted a debtor in possession under sections 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S. W.R. Co.*, 106 U.S. 286 (1882).  Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization matter, that the court was not "helpless" to apply the rule to supply creditors where the alternative was

the cessation of operations), including the United States Court of Appeals for the Third Circuit,

which recognized the doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d

Cir. 1981).

29.     In *In re Lehigh*, the Third Circuit held that a court could authorize the payment of

prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.*

(stating that a court may authorize payment of prepetition claims when there "is the possibility

that the creditor will employ an immediate economic sanction, failing such payment"); *see also*

*In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of

payment doctrine permits "immediate payment of claims of creditors where those creditors will

not supply services or material essential to the conduct of the business until their pre-

reorganization claims have been paid"); *In re Just for Feet*, 242 B.R. at 824-25 (noting that

debtors may pay prepetition claims that are essential to continued operation of business); *In re*

*Colum. Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

30.     The necessity of payment doctrine is designed to foster the rehabilitation of a

debtor in reorganization cases, which courts have recognized is "the paramount policy and goal

of Chapter 11."  *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Just For Feet*, 242 B.R. at 826

(finding that payment of prepetition claims to certain trade vendors was "essential to the survival

of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127

B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition

claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy

Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment

of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to

reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023

(Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation ...."); 3 COLLIER ON BANKRUPTCY ¶ 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately). The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, and will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

31.     The authority, but not direction, to satisfy the PACA Claims and Lien Claims in the initial days of these chapter 11 cases without disrupting their business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are willing and, importantly, able to conduct business as usual during their chapter 11 cases.

32.     The Debtors' operations also require the seamless coordination of many unrelated third-parties at every stage in the supply chain.  Collectively, the Debtors' supply chain ensures that the Debtors receive all of the food, products, and supplies necessary to operate their businesses and provide their customers with the high-quality food expected under their brands. Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors' not having sufficient food, products, and supplies to operate their businesses.  Given the highly-competitive local and regional family restaurant and quick-service restaurant markets, such a result could cause a devastating impact on the Debtors' businesses and significantly impair their restructuring efforts.

01:14595263.1

33.     Moreover, Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods, merchandise, or finished products in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  As described above, under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  As a result, the Debtors anticipate that certain of the Lien Claimants may assert and/or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.

**B.      Payment of Allowed PACA Claims In the Ordinary Course of Business Is Warranted.**

34.     The prompt and full payment of PACA Claims should be authorized by this Court.  As described above, assets governed by PACA do not constitute property of the Debtors' estates.  *See In re Kornblum & Co.*, 81 F.3d 280, 284 (2d Cir. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).  As a result, the distribution of assets to the holders of PACA Claims falls outside the priority scheme set forth in the Bankruptcy Code, and such holders are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.  *See, e.g., In re Magic Rests., Inc.*, 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377-78 (3d Cir. 1994).  Moreover, the disposition of PACA Trust Assets is subject to the jurisdiction of the bankruptcy court.  *See Monterey Mushrooms, Inc. v. Carolina Produce Distribs., Inc.*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit & Produce Co.*, 86 B.R. 14, 16 (Bankr. D. Conn. 1988).  Accordingly, the relief requested herein does not prejudice the Debtors' creditors or any party in interest in the chapter 11 cases.

35.     Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and the PACA Vendors.  Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' efforts in connection with these chapter 11 cases.  Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors, their management team and their professional advisors.

36.     Lastly, in certain circumstances, officers or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA.  *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *see also Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will inquire (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to the PACA creditors, to determine personal liability). Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases.  Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful reorganization strategy and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing

documents, employment agreements, and applicable laws, to the detriment of all of the Debtors' stakeholders.

37.     Courts in this district have routinely granted similar relief with respect to the treatment of PACA Claims.  *See, e.g., In re Amicus Wind Down Corporation*, No. 11-13167 (Bankr. D. Del. Oct. 6, 2011); *In re Perkin's & Marie Callender's Inc.*, Case No. 11-11795 (KG) (Bankr. D. Del. June 14, 2011); *In re Buffets Holdings, Inc.*, No. 08-10141 (Bankr. D. Del. Feb. 13, 2008).

**C.      Paying the PACA Claims and Lien Claims Now Will Not Affect Creditor Recoveries.**

38.     The relief requested herein will not affect the recovery of creditors in these chapter 11 cases.  As stated above, assets governed by PACA do not constitute property of the Debtors' estates.  Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.  The Debtors' requested relief affects only the timing of the PACA Claims payment, and will not prejudice the recovery of other creditors.  Additionally, in instances where the amounts owed to Lien Claimants is less than the value of the goods that could be held to secure a Lien Claim, such parties are arguably fully-secured creditors of the Debtors' estates.  In such instances, payment now only provides such parties with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.

**D.      The Court Should Allow the Debtors to Pay Section 503(b)(9) Claims in the Ordinary Course of Business.**

39.     As noted above, certain vendors may be entitled to request an administrative expense priority claim under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods, in the ordinary course of business, within the twenty-day period immediately prior to the Petition Date.  Because such claims are entitled to priority status under section

01:14595263.1

503(b)(9) of the Bankruptcy Code, the Debtors must pay the claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority). Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to pay. Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so, or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan.

40.     Thus, payment of claims arising under section 503(b)(9) affects the timing, but not the amount, of such payment. As a result, the Debtors respectfully submit that they should have the authority (but not the direction) to pay such claims, in the ordinary course of business, during the pendency of the chapter 11 cases, to the extent necessary to preserve the going-concern value of the chapter 11 estates. Since the enactment of section 503(b)(9) of the Bankruptcy Code, courts in this jurisdiction have exercised their discretion and have authorized the payment of prepetition claims under section 503(b)(9) of the Bankruptcy Code at the outset of a chapter 11 case. *See, e.g., In re Perkin's & Marie Callender's Inc.*, Case No. 11-11795 (KG) (Bankr. D. Del. June 14, 2011). Indeed, in granting a request for similar relief, at least one judge in this District asked an objecting United States Trustee, "[a]rguably, would you agree that the debtor would be able to pay the 503(b)(9) claims without Court approval?" Transcript of Hearing Held on Oct. 31, 2006, at 24:14-16, *In re Dura Auto.*, No. 06-11202 (approving payment of claims under section 503(b)(9) of the Bankruptcy Code as part of "first day" relief).

41.     As explained above, it is critical to the Debtors' chapter 11 efforts that they continue to receive goods and services, as applicable, from the Vendors on an uninterrupted basis

throughout the chapter 11 process.  The Debtors believe that without the relief requested herein, many Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors and their estates.

42.    Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

**E.    The Court Should Authorize the Debtors' Banks to Honor Payments in respect of the Claims.**

43.    The Debtors also request that the Court authorize the Debtors' Banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all prepetition obligations described herein, whether such checks or other requests were submitted prior to or after the Petition Date.  The Debtors further request that the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to any order of the Court granting the relief requested in this Motion.

**<u>Reservation of Rights</u>**

44.    Nothing herein or the Proposed Order (when and if entered), nor as a result of any payment made pursuant to the Proposed Order (when and if entered), shall be deemed or construed as (a) an admission as to the validity, priority or amount of any claim against the Debtors or their estates or an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (b) a waiver of any of the rights of the Debtors and their estates, or shall impair the ability of the Debtors and their estates, to contest the validity, priority and amount of any claim or any payment made pursuant to the Proposed Order (when and if entered).

01:14595263.1

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

45.     Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the Claims because such relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep 't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)).

46.     As described above, and in the Zielke Declaration, the continuity and viability of the Debtors' business operations relies heavily on the uninterrupted delivery of essential food, products, and supplies.  The failure of any Vendor to deliver essential food, products, or supplies or to render services to the Debtors would have immediate and detrimental consequences to the Debtors' businesses and would decrease value to the detriment and prejudice of all of the Debtors' stakeholders.  The Debtors cannot risk even the perception that their restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these chapter 11 cases.  Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Vendors is critical to their continued operations and greatly increases the likelihood of  successfully prosecuting these chapter 11 cases.

47.     Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rule 6004(h)

48.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the Proposed Order (when and if entered).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is

stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

Fed. R. Bankr. P. 6004(h). For the reasons set forth above, the Debtors submit that ample cause

exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as

any delay in satisfying the Claims would jeopardize the Debtors' business operations and their

efforts in connection with these chapter 11 cases, to the detriment of their estates and creditors.

### Notice

49.     Notice of this Motion has been provided to the following parties: (i) the U.S.

Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service;

(v) counsel to the agent for the Debtors' prepetition first lien lenders; (vi) counsel to the agent for

the Debtors' prepetition second lien lenders; and (vii) those creditors holding the thirty-five (35)

largest unsecured claims against the Debtors' estates (on a consolidated basis). Notice of this

Motion and any order entered on this Motion will be served as required by Rule 9013-1(m) of

the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court

for the District of Delaware. The Debtors submit that, in light of the nature of the relief

requested, no other or further notice need be given.

### No Prior Request

50.     No prior request for the relief sought in this Motion has been made to this or any

other court.

01:14595263.1

### Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order,

granting the relief requested herein and such other and further relief as is just and proper.

Dated: December 15, 2013          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                                        */s/ Robert F. Poppiti, Jr.*
                                        Robert S. Brady (No. 2847)
                                        Robert F. Poppiti, Jr. (No. 5052)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone:  (302) 571-6600
                                        Facsimile:  (302) 571-1253

                                            and

                                        Adam H. Friedman
                                        Jordanna L. Nadritch
                                        Jonathan T. Koevary
                                        OLSHAN FROME WOLOSKY LLP
                                        Park Avenue Tower
                                        65 East 55th Street
                                        New York, New York 10022
                                        Telephone:(212) 451-2300
                                        Facsimile:  (212) 451-2222

                                        *Proposed Counsel to the Debtors*

**EXHIBIT A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F & H ACQUISITION CORP., et al.,[1] | Case No. 13-13220 (_____) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. _____** |

## ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS (A) ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT, (B) OF OTHER LIEN CLAIMANTS, AND (C) ARISING UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE AND (II) GRANTING CERTAIN RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay (a) the PACA Claims, (b) the Lien Claims, and (c) certain Section 503(b)(9) Claims, in the ordinary course of business as such claims come due, and (ii) authorizing the Banks, when requested by the Debtors in their sole discretion, to receive,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  F & H Acquisition Corp. (2666); 505 Entertainment, Ltd. (4594); Alabama Fox & Hound, Inc. (5894); Bryant Beverage Corporation (0639); Champps Entertainment, Inc. (0491); Champps Entertainment of Texas, Inc. (7242); Champps of Maryland (1010); Champps Operating Corporation (5130); Downtown Beverage Corp. (3943); F & H of Iowa, Inc. (2434); F & H of Kennesaw, Inc. (5997); F & H Restaurant Corp. (8349); F & H Restaurant of Georgia, Inc. (2200); F & H Restaurant of Texas, Inc. (9871); Fox & Hound of Arizona, Inc. (3585); Fox & Hound of Colorado, Inc. (7166); Fox & Hound of Illinois, Inc. (3003); Fox & Hound of Indiana, Inc. (5676); Fox & Hound of Kansas, Inc. (7699); Fox & Hound of Kentucky, Inc. (0777); Fox & Hound of Littleton, Inc. (2894); Fox & Hound of Louisiana, Inc. (0477); Fox & Hound of Maryland, Inc. (7608); Fox & Hound of Nebraska, Inc. (5786); Fox & Hound of New Jersey, Inc. (0951); Fox & Hound of New Mexico, Inc. (5620); Fox & Hound of Ohio, Inc. (3963); Fox & Hound of Oklahoma, Inc. (2928); Fox & Hound of Texas, Inc. (0979); Fox & Hound Restaurant Group (6614); Fox & Hound, Inc. (9035); Fox & Hound II, Inc. (9540); Fuqua Beverage Corp. (4906); Jackson Beverage Corporation (3948); N. Collins Entertainment, Ltd. (4596); Raider Beverage Corporation (4993); Rocket Beverage Corporation (9829); Shenandoah Beverage Corporation (8087); Tent Finance, Inc. (5335); Tent Restaurant Operations, Inc. (5556); Willowbrook Beverage Corp. (1601); Winston-Salem Fox & Hound, Inc. (8319).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1551 N. Waterfront Pkwy, Suite 310, Wichita, KS 67206).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

01:14595263.1

process, honor, and pay all checks and electronic payment requests related to the Claims, all as set forth more fully in the Motion; and upon the Zielke Declaration; and this Court having found that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors and other parties in interest; and this Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **it is HEREBY ORDERED THAT**:

1.     The Motion is granted.

2.     The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy all valid PACA Claims in the ordinary course of business in an aggregate amount not to exceed $475,000.

3.     Any PACA Vendor who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or

01:14595263.1

priority against the Debtors, their property, their estates, and any PACA Trust Assets, but only to the extent that payment has been received by such PACA Vendor on account of its PACA Claim.

4.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy in the ordinary course of business all valid Lien Claims in an aggregate amount not to exceed $300,000.

5.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy all valid Section 503(b)(9) Claims, in the ordinary course of business in an aggregate amount not to exceed $1.6 million.

6.      In the event that any Vendor that has received payment for its Claim refuses to continue to provide goods and services, as applicable, on an uninterrupted basis, to the Debtors in accordance with (a) the terms and provisions of this Order, (b) Historical Trade Terms, or (c) such other terms agreed upon by the Debtors and such Vendor, without further order of this Court and in their sole discretion, the Debtors shall be authorized to deem the payments made to any such Vendor to have been in payment of any then-outstanding postpetition claims of such Vendor.  If this situation arises, the previously paid Claims of the Vendor shall be reinstated as Claims in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Vendor.  To the extent that the payments made to the Vendor on account of the previously paid Claims exceed the post-petition amounts then owed to such Vendor, all rights of the Debtors and their estates to recover such payments shall be reserved.

7.      The Debtors' Banks shall be, and hereby are, authorized, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all Claims, whether those

01:14595263.1

3

checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

8.      The Debtors' Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for in this Order.

9.      Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as (a) an admission as to the validity, priority or amount of any claim or lien against the Debtors or their estates or an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or (b) a waiver of the rights of the Debtors and their estates, or shall impair the ability of the Debtors and their estates, to contest the validity, priority and amount of any claims or any payment made pursuant to this Order.

10.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

11.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

13.     The relief granted herein is subject to any interim or final order of the Court authorizing the Debtors' use of any post-petition financing or cash collateral.

01:14595263.1

14.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated:  December _____, 2013
            Wilmington, Delaware

_____
United States Bankruptcy Judge