## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F & H ACQUISITION CORP., et al.,[1] | Case No. 13-13220 (____) |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date: To be determined<br>Objection Deadline: To be determined |

## DEBTORS' MOTION REQUESTING (A) THE SCHEDULING OF AN AUCTION AND SALE HEARING IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS, (B) APPROVAL OF BIDDING PROCEDURES FOR SUCH ASSETS, (C) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN BID PROTECTIONS WITHOUT FURTHER ORDER OF THE COURT, (D) APPROVAL OF THE FORM AND SCOPE OF NOTICE OF AUCTION AND SALE HEARING, (E) APPROVAL OF PROCEDURES FOR THE ASSUMPTION, ASSIGNMENT AND SALE OF CONTRACTS AND LEASES TO PURCHASER, AND (F) APPROVAL OF SALE OF THE DEBTORS' ASSETS TO PURCHASER FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS

F & H Acquisition Corp. and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors") hereby move this Court (this "Motion")[2] and respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: F & H Acquisition Corp. (2666); 505 Entertainment, Ltd. (4594); Alabama Fox & Hound, Inc. (5894); Bryant Beverage Corporation (0639); Champps Entertainment, Inc. (0491); Champps Entertainment of Texas, Inc. (7242); Champps of Maryland (1010); Champps Operating Corporation (5130); Downtown Beverage Corp. (3943); F & H of Iowa, Inc. (2434); F & H of Kennesaw, Inc. (5997); F & H Restaurant Corp. (8349); F & H Restaurant of Georgia, Inc. (2200); F & H Restaurant of Texas, Inc. (9871); Fox & Hound of Arizona, Inc. (3585); Fox & Hound of Colorado, Inc. (7166); Fox & Hound of Illinois, Inc. (3003); Fox & Hound of Indiana, Inc. (5676); Fox & Hound of Kansas, Inc. (7699); Fox & Hound of Kentucky, Inc. (0777); Fox & Hound of Littleton, Inc. (2894); Fox & Hound of Louisiana, Inc. (0477); Fox & Hound of Maryland, Inc. (7608); Fox & Hound of Nebraska, Inc. (5786); Fox & Hound of New Jersey, Inc. (0951); Fox & Hound of New Mexico, Inc. (5620); Fox & Hound of Ohio, Inc. (3963); Fox & Hound of Oklahoma, Inc. (2928); Fox & Hound of Texas, Inc. (0979); Fox & Hound Restaurant Group (6614); Fox & Hound, Inc. (9035); Fox & Hound II, Inc. (9540); Fuqua Beverage Corp. (4906); Jackson Beverage Corporation (3948); N. Collins Entertainment, Ltd. (4596); Raider Beverage Corporation (4993); Rocket Beverage Corporation (9829); Shenandoah Beverage Corporation (8087); Tent Finance, Inc. (5335); Tent Restaurant Operations, Inc. (5556); Willowbrook Beverage Corp. (1601); Winston-Salem Fox & Hound, Inc. (8319). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1551 N. Waterfront Pkwy, Suite 310, Wichita, KS 67206).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, or the Bidding Procedures, as applicable.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dates as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

3.      As described in the Declaration of James Zielke in Support of First Day Motions (the "Zielke Declaration"), the Debtors are leading operators of sport-bar and family dining restaurants.  The Debtors' operations include the management of approximately 101 restaurants and oversight of 11 franchised restaurant locations, located in 27 states.  Of these 101 restaurants, the Debtors' operate 50 restaurants under the Fox & Hound brand name, 16 restaurants under the Bailey's Sports Grille brand name and 35 restaurants under the Champps brand name.  The Debtors employ approximately 6,000 hard working employees across the country.

4.      In recent years, the restaurant industry, including the Debtors' businesses, has been hurt by the significant U.S. economic downturn and increased food costs.  New advertising campaigns, operational improvement initiatives and cost-cutting programs implemented by the

Debtors have successfully mitigated certain negative effects on their businesses; however, the Debtors have not been immune to the effects of the economy and rising food prices, and their financial performance has suffered significantly. In late 2012, as the Debtors' liquidity position deteriorated, they struggled to meet their debt service obligations and failed to satisfy financial covenants under their prepetition credit agreements, resulting in defaults with the Debtors' senior and junior lender groups. Since February 2013 the Debtors have explored available strategic alternatives as part of their overall turnaround efforts. After months of careful review, and after a diligent pre-petition process that sought investors, buyers and lenders, the Debtors determined that a chapter 11 filing, coupled with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most efficient way to best preserve the jobs of their employees and maximize a return for the Debtors, their estates, and all parties in interest.

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of Bankruptcy Code in order to permit them to restructure their balance sheets and operations to restore profitability. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

6.     As of the Petition Date, the Debtors were parties to that certain $80,000,000 Credit Agreement dated as of March 19, 2012, by and among the Debtors as Borrowers, and GECC (the "First Lien Agent") as Lender and as agent on behalf of itself and other Lenders (the

"First Lien Lenders") thereto (as amended from time to time, the "First Lien Credit Agreement"). The First Lien Credit Agreement is secured by substantially all of the Debtors' assets.

7.      In addition, as of the Petition Date, the Debtors were parties to that certain $37,100,000 Credit Agreement dated as of March 19, 2012 by and among the Debtors as Borrowers, and Cerberus Business Finance, LLC (the "Second Lien Agent," and collectively with the First Lien Agent, the "Agents") as Lender and as agent on behalf of itself and other Lenders (the "Second Lien Lenders") thereto (as amended from time to time, the "Second Lien Credit Agreement," and together with the First Lien Credit Agreement, the "Credit Agreements"). The Second Lien Credit Agreement is secured by substantially all of the Debtors' assets, junior in priority only to the liens granted pursuant to the First Lien Credit Agreement.

**The Debtors' Efforts to Sell Substantially All of Their Assets and Raise New Financing**

8.      Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives. To assist the Debtors' board of directors in their evaluation of strategic alternatives, in February 2013, the Debtors retained investment banker Imperial Capital, LLC ("Imperial") to explore either a recapitalization, re-financing or a sale of all or specific portions of the Debtors' operations.

9.      Imperial prepared a "teaser" and a detailed confidential information memorandum and set up an electronic data room for interested parties to conduct due diligence. Imperial conducted an extensive process that reached out to approximately 164 parties, including banks and non-institutional investors, resulting in the Debtors' entry into approximately 80 non-disclosure agreements. The Debtors received eight indications of interest from potential purchasers. The Debtors conducted five meetings with potential purchasers.

10.     Imperial focused the marketing process on seeking a stalking horse bidder for a possible bankruptcy sale. In connection with this process, Imperial had a second round of

discussions with seven parties which had previously expressed interest. None of those discussions produced a stalking horse bidder.

11.     Then, in October 2013, Imperial contacted nine new possible buyers and 22 previously-contacted buyers with the objective of finding a qualified stalking horse bidder. Despite extensive efforts, the Debtors were unable to secure a stalking horse offer.  Thus, the Debtors determined that it was in their best interests to commence a sale process that would procure bids through an auction.  To ensure the Debtors receive the highest and best offer for the sale of substantially all of their assets, the Debtors, together with Imperial, will continue the marketing process for the sale of the Debtors' assets.

12.     To facilitate an orderly sale process, the First Lien Agent has agreed to fund the Debtors' postpetition financing needs, through the Debtors' proposed senior secured debtor-in-possession credit agreement (the "DIP Credit Agreement").  The Debtors are separately seeking the Court's approval of the DIP Credit Agreement which, if approved, will, among other things, provide the Debtors with (i) a postpetition revolving credit facility in a principal amount not to exceed approximately $3.5 million on an interim basis and approximately $9.6 million on a final basis, and (ii) a postpetition letter of credit facility comprised of certain prepetition letters of credit, including any renewals thereof, in an aggregate face amount not to exceed $2.269 million, plus $1,000,000 in postpetition letters of credit (to be applied against the postpetition revolving facility).  The DIP Credit Agreement contains certain milestones that facilitate a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code .

13.     The Debtors believe that an open and transparent auction and sale process will determine the highest and best bid and maximize value for the Debtors' assets.  The primary purpose of the sale process will be to provide for a sale (the "Sale") of substantially all of the

Debtors' assets and operations, as a going concern, to the party that submits the highest and best offer in accordance with the Bidding Procedures.

## The Sale

14. The Debtors are proceeding with this Motion in order to create an appropriate timetable for the Sale, consistent with the milestones under the DIP Credit Agreement and to provide bid protections to a Stalking Horse Purchaser if the Debtors enter into an Asset Purchase Agreement with such a party prior to the Auction. Upon selecting a Stalking Horse Purchaser, the Debtors will, no more than two (2) business days later, file with the Court and serve notice of their selected Stalking Horse Purchaser, together with a copy of the relevant Purchase Agreement.

15. The Debtors have decided to sell substantially all the Purchased Assets in a sale pursuant to section 363 of the Bankruptcy Code for several important reasons. First, the Debtors believe that the nature of their business relationships with vendors is fragile and that it is therefore crucial for the business to emerge from chapter 11 as quickly as possible. Second, a sale of the Debtors' assets will enable the Debtors to continue to operate as a going concern, retain their growing customer base, and avoid an erosion of customer and vendor confidence that could result from a protracted chapter 11 process. Third, the Debtors do not have the financial resources for a protracted stay in chapter 11. Finally, the Debtors' First Lien Lenders, which have the largest economic stake in the Debtors' enterprise, support a sale process under section 363 of the Bankruptcy Code, and have agreed to provide necessary debtor in possession financing to further the process.

16. Accordingly, to ensure the sale process, which commenced in February 2013, can be finalized with adequate additional time, and to comply with the terms of the DIP Credit Agreement, the Debtors are requesting that the following timeline and other provisions govern

the sale process, as provided for in the order substantially in the form of **Exhibit 1** attached hereto (the "Bid Procedures Order" or the "Bidding Procedures Order"):

(i) scheduling an auction for the sale of the Purchased Assets (the "Auction") on or prior to March 4, 2014, and a hearing to approve the sale of the Purchased Assets (the "Sale Hearing") on or before March 6, 2014;

(ii) approving deadlines and procedures (the "Bid Procedures" or the "Bidding Procedures") for submitting competing bids for the Purchased Assets;

(iii) authorizing the Debtors to provide certain bid protections to a stalking horse purchaser (the "Stalking Horse Purchaser") without further order of the Court;

(iv) approving the Debtors' form Asset Purchase Agreement (the "Asset Purchase Agreement"), a copy of which will be filed with the Court in advance of the hearing on the Bid Procedures Order;

(v) approving the form and manner of the notice of the Auction and the Sale Hearing, substantially in the form annexed as Exhibit B to the Bid Procedures Order (the "Sale Notice"); and

(vi) approving procedures for the assumption, assignment and sale of contracts and leases to any purchaser(s) of the Purchased Assets, and/or to resolve any objections thereto in the form annexed as Exhibit C to the Bid Procedures Order.

17. The Debtors are in the process of soliciting bids for the Purchased Assets utilizing the Bidding Procedures. The Bidding Procedures, which are set forth in full in the proposed Bid Procedures Order, describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any auction, and the

selection and approval of the Winning Bidder. The price to be paid by the Winning Bidder for the Purchased Assets and the terms and conditions for the sale of such assets will be established based on the bids received by the Bid Deadline and if more than one Qualified Bid is received, at the Auction to thereafter be conducted.

18.     The Debtors seek approval to provide certain bidding protections for the potential Stalking Horse Purchaser, which will be no more beneficial to such counterparty than those described herein. Specifically, such bidding protections may include a (i) break-up fee equal to no more than 3% of the Stalking Horse's purchase price, and (ii) reasonable expense reimbursement of the Stalking Horse Purchaser's reasonable out of pocket expenses (collectively, the "Break-Up Fee"). Other bid protections include minimum requirements for initial and subsequent overbids, in each case no more beneficial to the Stalking Horse than those described in the Bidding Procedures.

19.     The Bid Procedures Order proposed by the Debtors further provides, among other things, that the Debtors will have the right to (i) adjourn the Auction or the Sale Hearing and (ii) modify certain relief requested herein prior to or at the Sale Hearing, including modifying the proposed Asset Purchase Agreement and the Bid Procedures.

**Procedural Requirements Included in the DIP Credit Agreement**

20.     The DIP Credit Agreement, among other things, requires the Debtors to adhere to the following sale process schedule:

| Sale Milestone | Deadline |
|---|---|
| Entry of Bid Procedures Order | January 8, 2014 |
| Qualified Bids Due | February 25, 2014 |
| Commencement of the Auction | March 4, 2014 |

Entry of Sale Order[3]                  March 7, 2014

Closing                                 March 26, 2014

DIP Credit Agreement at 4.22.

## Terms of the Asset Purchase Agreement

21.     In an effort to aid the sale process for the Purchased Assets and generate competitive bidding, the Debtors will submit a form Asset Purchase Agreement, in advance of the hearing on the Bid Procedures Order, that will serve as a baseline for all prospective bidders to negotiate from.

22.     The principal terms of the Asset Purchase Agreement will be as follows:[4]

**Purchase Price**          Section 3.1 of the Asset Purchase Agreement provides that the purchase price (the "Purchase Price") for the Purchased Assets (as defined below) shall be (i) an amount in cash, plus (ii) the assumption of the Assumed Liabilities by the Buyer at Closing.

**Purchased Assets**        Section 2.1 of the Asset Purchase Agreement lists the purchased assets, and provides that the Stalking Horse Purchaser shall acquire, free and clear of all liens, claims, and interests, all of the tangible and intangible assets, real property and personal property constituting, used in the conduct of, or related to the Debtors' business (collectively, the "Purchased Assets"); provided, however, that, the foregoing shall not include Excluded Assets, discussed below.  The Purchased Assets shall include, without limitation, the following related to, used in, required for, or connected with the Debtors' business:  (i) accounts receivable; (ii) all cash, cash equivalents, bank deposits, and similar cash items; (iii) inventory; (iv) deposits and other prepaid charges; (v) rights under the Debtors' leases; (vi) furniture, fixtures, and equipment; (vii) intellectual property; (viii) the Purchased Contracts; (ix) documents, files, customer lists, permits, and supply lists in connection with the Debtors' Business; (x) permits, including liquor licenses; (xi) supplies used in connection with the Business (xii) insurance policies or rights to proceeds; (xiii) all rights under non-disclosure, confidentiality, non-compete, or non-

---

[3] Notwithstanding the requirement of Local Rule 6004-1(b)(ii), the proposed form of order authorizing and approving the Sale (the "Sale Order") will be negotiated with the Purchaser and, accordingly, is not attached hereto. The Debtors will file a proposed Sale Order, and serve such proposed order, on interested parties in advance of the Sale Hearing.

[4] In the event of any inconsistency between this Motion and the Asset Purchase Agreement, the Asset Purchase Agreement shall govern.

01:14595322.1

|                 | solicitation agreements with employees and agents or third parties; (xiv) all rights pursuant to warranties, representations, and guarantees made by suppliers, manufacturers, and contractors; (xv) cash refunds for taxes received by the Debtors after the Closing Date; (xvi) all supplier lists, goodwill, and other intangible assets; (xvii) rights, claims, or interest in refund, rebate, abatement or recovery for Taxes; (xviii) all prepaid taxes and tax credits; (xix) all rights to telephone and facsimile numbers and email addresses used by the Debtors; (xx) all other property and assets used in the conduct of the Business; and (xxi) all other assets, properties, rights and claims of Debtors that are not otherwise expressly designated as excluded Assets. |
|-----------------|---|
| **Excluded Assets** | Section 2.2 of the Asset Purchase Agreement lists the excluded assets which the Debtors shall retain all right, title, and interest thereto (collectively, the "<u>Excluded Assets</u>").  The Excluded Assets include, without limitation:  (i) the Cash Payment; (ii) deposits relating to Real Property Leases that are Excluded Assets; (iii) Excluded Contracts; (iv) intellectual property rights not purchased by the Stalking Horse Purchaser; (v) any confidential records of an employee, books and records that are required by law or necessary for the Debtors to retain, corporate documents, and other documents that the Debtors are required by law to retain or deem necessary to retain; (vi) any causes of action under chapter 5 of the Bankruptcy Code that are not Purchased Assets; (vii) all of the Debtors' rights under the Asset Purchase Agreement and/or other documents executed in connection therewith; (viii) asset set forth on Schedule 2.2(f); and (ix) equity interests in the Debtors. |
| **Termination** | Section 4.4 of the Asset Purchase Agreement sets forth circumstances under which the Asset Purchase Agreement may be terminated.  Among other things, these provisions allow the Purchaser to terminate if (i) the Court has not entered the Bid Procedures Order on or before January 8, 2014; (ii) the Court has not entered the Sale Order on or before March 7, 2014; or (iii) the Closing has not occurred on or before March 26, 2014. |

23.    Moreover, in addition to the above-described salient features of the Asset Purchase Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors anticipate the following with respect to the Asset Purchase Agreement and those provisions that are required to be highlighted under such Local Rule: [5]

---

[5] All terms of the Asset Purchase Agreement are subject to change based on a negotiation with a prospective bidder.

(a)     Sale Agreements with Management.  The Asset Purchase Agreement may contain agreements with management to be entered into in connection with the sale of the Purchased Assets.

(b)     Releases.  The Asset Purchase Agreement may contain for the delivery of certain releases by the Debtors, the Stalking Horse Purchaser or the Winning Bidder, as applicable, and the First Lien Agent and the First Lien Lenders and the Second Lien Agent and the Second Lien Lenders as a condition to the Closing.

(c)     Private Sale/No Competitive Bidding.  As set forth below in greater detail, the Debtors intend to conduct an Auction for the sale of the Purchased Assets if there is more than one Qualified Bidder.

(d)     Closing and Other Deadlines.  The Asset Purchase Agreement may provide that the Purchaser may terminate the Asset Purchase Agreement if:  (i) the Court has not entered the Bid Procedures Order on or before January 8, 2014; (ii) the Court has not entered the Sale Order on or before March 7, 2014; or (iii) the Closing has not occurred on or before March 26, 2014

(e)     Good Faith Deposit. The Asset Purchase Agreement will likely provide that the Purchaser must submit a good faith deposit in the amount of five percent (5%) of the Purchase Price.

(f)     Interim Arrangements with Proposed Buyer.  The Asset Purchase Agreement will likely require the Debtors to continue to operate their business in the ordinary course until the Closing Date (as defined below).

(g)     Use of Proceeds.  The Asset Purchase Agreement may contain a provision that addresses the use of proceeds.

(h)     Tax Exemption.  The Asset Purchase Agreement may address the use of tax exemptions.

(i)     Record Retention.  The Asset Purchase Agreement may provide that the Debtors and the Stalking Horse Purchaser or the Winning Bidder, as applicable, agree that each of them shall preserve and keep the books and records held by it relating to the Debtors' pre-closing business for a period of sixty (60) days from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party.

(j)     Sale of Avoidance Actions.  The Asset Purchase Agreement will likely exclude from the Purchased Assets the Debtors' rights, claims or causes of action, including any rights or claims as arise under chapter 5 of the Bankruptcy Code, against certain of the Debtors' vendors.

(k)     Sale Free and Clear of Liens, Claims and Interests.  The Asset Purchase Agreement will likely provide that, other than the real property subject to the Real

Property Leases and the personal property subject to the Personal Property Leases, the Debtors have good title to the Purchased Assets and, at the Closing, the Stalking Horse Purchaser or the Winning Bidder, as applicable, pursuant to the Sale Order, shall acquire good title in, to and under (subject to certain exceptions) all of such Purchased Assets, in each case free and clear of certain liens, claims and interests to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

## Bid Procedures

24.     The Debtors believe that the following Bid Procedures provide an appropriate framework for selling the Purchased Assets and will enable the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and creditors.  Certain key provisions of the Bid Procedures are summarized as follows: [6]

(a)     Diligence.  Upon execution of a confidentiality agreement, any person identified by the Debtors, with the assistance of their financial advisors, as reasonably likely to be a Qualified Bidder that wishes to conduct due diligence on the Debtors or their assets with respect to a potential overbid may be granted access to all material information that has been or will be provided to the Stalking Horse Purchaser.

(b)     Submission of Bids.

(i)     Bids.  Any prospective bidder, other than the Stalking Horse Purchaser, if selected  (each, a "Potential Bidder," and once designated by the Debtors as a qualified bidder, a "Qualified Bidder") that wishes to participate in the bidding process for the Purchased Assets must, **no later than February 25, 2014 (i.e., six days prior to the Auction), at 5:00 p.m. Prevailing Eastern Time** (the "Bid Deadline"):

a)      Submit to the Debtors, any official committee appointed in these chapter 11 cases (the "Committee"), the DIP Agent, the First Lien Agent, and the Second Lien Agent, through their respective counsel, an irrevocable offer in the form of an executed asset purchase agreement (the "Modified Agreement") without financing or due diligence contingencies (unless consented to by the First Lien Agent, DIP Agent, and, if the Second Lien Agent or its designee has not submitted a bid that remains open, the Second

---

[6] In the event of any inconsistency between the Bid Procedures described herein and those in the Bid Procedures Order, the Bid Procedures Order shall govern.  All parties are encouraged to review the Bid Procedures Order in its entirety.  The Bid Procedures Order contains all of the terms and conditions governing the submission of bids, the auction and other sale procedures for the sale of the Debtors' assets.

Lien Agent), and on such other terms that are no less favorable to the Debtors than those contained in the Stalking Horse Purchase Agreement (as defined in the Bid Procedures Order), if any, at a price that provides for the following: (i) the Purchase Price (as defined in the Stalking Horse Purchase Agreement); (ii) the Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement); (iii) the Break-Up Fee; and (iv) $100,000. A Qualified Bid may not restructure the Roll-Up DIP Obligations without the consent of the DIP Lenders, the First Lien Obligations, without the consent of the First Lien Lenders, or the Second Lien Obligations without the consent of the Second Lien Lenders.

b) Make a good faith cash deposit in the form of a cashier's check or wire transfer, in an amount not less than 5% of the Purchase Price (the "Bid Deposit") into an interest bearing escrow account (the "Segregated Account") that shall be opened by the Debtors for this purpose. The Bid Deposit shall immediately become non-refundable and credited toward the Purchase Price, if and when the transaction with the Potential Bidder approved by the Court (the "Winning Bid" and the "Winning Bidder") is consummated. If a Potential Bidder's bid is not designated as a Qualified Bid (as defined below), or such bid is not approved as the Winning Bid or the Back-Up Bid at the Sale Hearing, the Bid Deposit of such bidder, plus accrued interest, if any, will be returned to such bidder within three (3) business days after the conclusion of the Sale Hearing.

c) Provide written evidence reasonably satisfactory to the Debtors, the DIP Agent, the First Lien Agent, the Second Lien Agent and the Committee of (A) its financial ability to (i) fully and timely perform all obligations under the Modified Agreement if it is declared to be the Winning Bidder, and (ii) provide adequate assurance of future performance under all contracts and leases to be assigned to it; (B) its qualification to own the assets and operate the businesses that are the subject of the Modified Agreement in compliance with all federal, state and local laws; and (C) its corporate authority to enter into and consummate the Sale Transaction.

d) Disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtors.

e) Submit a "blacklined" or otherwise marked copy of the Modified Agreement reflecting the differences between the Modified

Agreement and the Asset Purchase Agreement, or the Stalking Horse Purchase Agreement (if applicable).

(ii) <u>Bid Deadline</u>. Bids must be received no later than **February 25, 2014 at 5:00 p.m. (Prevailing Eastern Time)** (the "<u>Bid Deadline</u>"), by (a) Olshan Frome Wolosky LLP 65 East 55th Street, New York, NY 10022, Attn: Adam Friedman, co-counsel for the Debtors, and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Robert S. Brady, co-counsel for the Debtors; (c) counsel to the Committee; (d) Latham & Watkins, Sears Tower, Suite 5800, Chicago, Illinois 60606 Attn: Peter P. Knight, Esq, co-counsel to the First Lien Agent and DIP Agent; (e) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801, Attn: Kurt Gwynne, co-counsel to the First Lien Agent and DIP Agent; (f) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067, Attn: Michael L. Tuchin, Esq. & David A. Fidler, Esq., co-counsel to the Second Lien Agent; (g) Landis Rath & Cobb, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis, co-counsel to the Second Lien Agent.

(c) <u>Determination of Qualified Bid Status</u>. In the event that the Debtors, in reasonable consultation with the Committee, the DIP Agent, the First Lien Agent, and the Second Lien Agent determine that a Bid satisfies each of the required components set forth herein, such Bid shall be determined to be a "<u>Qualified Bid</u>." The Debtors shall promptly notify the Stalking Horse Purchaser (if any), the DIP Agent, the First Lien Agent, and the Second Lien Agent of the identity of all Qualified Bidders. The Stalking Horse Purchaser shall be deemed to be a Qualified Bidder and the Stalking Horse Purchase Agreement shall be deemed a Qualified Bid.

(d) <u>Auction.</u>

(i) <u>Auction Date and Time</u>. In the event that the Debtors receive more than one Qualified Bid (including the Stalking Horse Purchaser) prior to the Bid Deadline that the Debtors will hold the Auction on **March 4, 2014, commencing at 10:00 a.m. (Prevailing Eastern Time)** at the offices of Olshan Frome Wolosky LLP 65 East 55th Street, New York, NY 10022, or at such other time, date and place as determined and announced by the Debtors, for consideration of the Qualified Bids, each as may be increased at such Auction.

(ii) <u>Incremental Bids</u>. Bidding will start at the highest Qualified Bid and will continue with minimum bid increments of $100,000.00 in cash.

(e) <u>The Winning Bidder</u>. At the conclusion of the Auction, the Debtors, in consultation with their financial advisors, their counsel, the Secured Lenders and the Committee, will determine which Qualified Bid is to be recommended to the

01:14595322.1

Court for approval as the highest or best offer (the "<u>Winning Bidder</u>"). The Bid Deposit of a Winning Bidder other than the Stalking Horse Bidder shall be forfeited if the Modified Agreement of such Winning Bidder is thereafter terminated by Seller as a result of a breach by the Winning Bidder of its obligations thereunder.

(f)     <u>Back-Up Bidders</u>. If bids have been submitted by more than one Qualified Bidder, the Qualified Bidder that makes the next-highest and/or best bid to that of the Winning Bidder shall become the back-up bidder (the "<u>Back-Up Bidder</u>") and such Back-Up Bidder's final and highest and/or best bid (the "<u>Back-Up Bid</u>") shall remain open pending the closing of the Winning Bid (the "<u>Closing Date</u>"). (If a bid of the Stalking Horse Purchaser is the next-highest and/or best bid to that of the Winning Bidder, then such bid of the Stalking Horse Purchaser shall be the Back-Up Bid.) If the transaction does not close prior to the Closing Date (as such date may be extended pursuant to the Bid Procedures), the Back-Up Bid, as selected by the Debtors at the Auction and approved as the Back-up Bid by the Court at the Sale Hearing, shall upon notice by the Debtors to the Back-Up Bidder, be deemed the Winning Bid without further order of the Court, and the Back-Up Bidder shall be required to consummate the transaction in accordance with the Stalking Horse Purchase Agreement or Modified Agreement, as applicable.

(g)     <u>Forfeit of Deposits</u>. Any deemed Winning Bidder who breaches any of its obligations under the Asset Purchase Agreement, Stalking Horse Purchase Agreement or the Modified Agreement, as applicable, shall forfeit its Bid Deposit. The forfeiture of the Bid Deposit shall be in addition to any other rights, claims and remedies that the Debtors and their bankruptcy estates may have against the Stalking Horse Bidder or such other Qualified Bidder, as applicable (unless otherwise provided in such Winning Bid).

(h)     <u>Break-Up Fee/Expenses</u>. Subject to the terms of the Asset Purchase Agreement and the Winning Purchase Agreement, or any other executed agreement binding upon the Debtors, any bidders presenting Bids shall bear their own costs and expenses in connection with the sale, whether or not such sale is ultimately approved. If the Stalking Horse Purchaser is not the Winning Bidder for the Purchased Assets, the Debtors shall, immediately upon the closing of the sale of the Purchased Assets to the Winning Bidder, pay to the Stalking Horse Purchaser the Break-Up Fee, which Break-Up Fee shall constitute an allowed claim against the Debtors' estates under Bankruptcy Code sections 503 and 507(a)(2).

25.     The Debtors, subject to the oversight and approval by the Court, and in reasonable consultation with the Committee, the DIP Agent, the First Lien Agent, and the Second Lien Agent shall supervise the bidding process and conduct the Auction in such a manner as to provide the Stalking Horse Purchaser and other Qualified Bidders a full, fair and equal

opportunity to participate in the Auction. The Debtors, in consultation with their financial advisors, their counsel and the Committee, shall determine which bid is to be recommended to the Court for approval. The Debtors shall request at the Sale Hearing that the Court authorize the Debtors to consummate the Sale Transaction to the Winning Bidder.

26. Only the Stalking Horse Purchaser and other Qualified Bidders may bid at the Auction. Copies of all Qualified Bids shall be provided to the Committee, the DIP Agent, the First Lien Agent, the Second Lien Agent, the Stalking Horse Purchaser and each other Qualified Bidder. At the commencement of the Auction, the Debtors shall identify the bid that they have determined to be the highest and/or best offer and shall permit the Stalking Horse Purchaser and other Qualified Bidders to submit higher and/or better bids. The DIP Agent or the First Lien Agent, on behalf of itself and any other lenders under the Debtors' postpetition debtor-in-possession financing facility and the Debtors' prepetition senior secured credit facility, and the Second Lien Agent each reserve the right to make a credit bid at the Auction pursuant to section 363(k) of the Bankruptcy Code.

27. The Debtors believe that the Bid Procedures are fair and appropriate and will maximize the recovery for the Debtors and their estates in connection with the sale of the Purchased Assets. The Bid Procedures provide for an open auction process with minimum barriers to entry and the proposed deadlines provide interested parties with sufficient time to perform due diligence on the Purchased Assets.

28. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be undertaken by private sale or by public auction. The Debtors believe a sale of the Purchased Assets pursuant to a public auction governed by the proposed Bid Procedures will maximize the sale proceeds received by the estate, which is the paramount goal

in any proposed sale of property of the estate.  See In re Dura Automotive Sys., Inc., Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.")  (internal citations omitted).

29.     The Bid Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets.  Bidding procedures should be approved when they provide a benefit to the estate, by maximizing the value of the Purchased Assets, and enhance competitive bidding.  Id. (citing Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien  Envt'l Energy, Inc.), 181 F.3d 527, 535-37 (3d Cir. 1999)) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate).  The Debtors believe that the Bid Procedures satisfy this standard and are consistent with other procedures previously approved in this district and in other bankruptcy courts.

30.     The Debtors submit that the Bid Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the consideration that should be received for the Purchased Assets.  Accordingly, approval of the Bid Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

### Notice Procedures

31.     The Debtors further request that the Court approve the Sale Notice because it satisfies the requirements of Bankruptcy Rule 2002.  Bankruptcy Rule 6004 provides that notice of a proposed sale of property outside the ordinary course pursuant to section 363(b) of the Bankruptcy Code must satisfy the requirements of Bankruptcy Rule 2002.  Pursuant to

01:14595322.1

Bankruptcy Rule 2002, the Debtors are required to notify their creditors of the sale of the Purchased Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. In accordance with such rules, the Debtors propose to serve copies of the Bid Procedures Order and the Sale Notice no later than three (3) business days after entry of the Bid Procedures Order, by first class mail, postage prepaid, or other method reasonably calculated to provide notice of the sale and the Auction, upon by first-class mail upon: (a) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets or a portion thereof during the past six (6) months; (b) all entities known by the Debtors to have asserted any lien, claim, or interest in the Purchased Assets; (c) all non-debtor parties to the Purchased Contracts; (d) the Office the United States Trustee for the District of Delaware (the "U.S. Trustee"); (e) counsel to any committee appointed in these cases; (f) any Governmental Body known to have a claim in the Bankruptcy Cases; (g) all other known creditors and equity security holders of the Debtors; (h) all Persons that have requested special notice in the Bankruptcy Cases; and (i) all other Persons as directed by the Court.

32.    The Debtors further propose to cause the Sale Notice to be published on (i) http://dm.epiq11.com/foxhound (the "Website") as soon as practicable after entry of this Order and (ii) on one occasion in either *The Wall Street Journal* or *The New York Times*, national editions, on or before ten (10) days after entry of the Bid Procedures Order.

33.    The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the sale of the Purchased Assets and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

34.     The Debtors also request that any responses or objections to the relief to be considered at the Sale Hearing, including, but not limited to, the Debtors' request to approve the sale of the Purchased Assets, (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington Delaware 19801, so as to be received **no later than February 25, 2014 at 4:00 p.m. (Prevailing Eastern Time)**.

### Assumption, Assignment, Sale and Cure of Contracts and Leases

35.     To facilitate and effect the sale of the Purchased Assets, the Debtors seek to assume and assign certain contracts and leases to the Stalking Horse Purchaser or the Winning Bidder, as applicable (the "Purchaser").  Therefore, the Debtors submit that it is necessary to establish (a) a process to pay cure obligations, if any, pursuant to section 365 of the Bankruptcy Code, for those contracts and leases that the Debtors seek to assume, assign and sell to the Purchaser, and (b) a process for counterparties of such contracts and leases to object (together, the "Cure Procedures").  The Debtors propose the following Cure Procedures:

(a)     Notice of Cure Procedures:

    (i)     At least twenty-eight (28) days prior to the Sale Hearing, the Debtors shall file with the Court and serve via first class mail on all Persons known by the Debtors to be a counterparty to a Contract a notice of assumption, assignment and cure substantially in the form attached to the Bid Procedures Order as Exhibit C (the "Notice of Assumption and Assignment").  The Notice of Assumption, Assignment and Sale shall include (a) a statement that the Contracts listed therein may be treated as "Purchased Contracts" under the Asset Purchase Agreement (or Stalking Horse Purchase Agreement or Modified Agreement) by their inclusion on Schedule 1.1(b) to the Asset Purchase Agreement (or a corresponding schedule in the Stalking Horse Purchase Agreement or Modified Agreement), (b) a statement that certain of the Contracts listed therein may be designated as "Designation Right Assets" under the Asset Purchase Agreement (or Stalking Horse Purchase Agreement or Modified Agreement) and thereafter rejected or assumed, assigned and sold at a date subsequent to the Closing Date, (c) the Debtors' calculation of the amount necessary, if any, to cure any and all defaults under the Contracts and

compensate the counterparties thereto for pecuniary loss in respect of any such default(s) (the "Cure Amount") as a condition to assumption, assignment and sale of such Contract under Bankruptcy Code sections 363 and 365(b), and (d) evidence of the Stalking Horse Bidder's (if one is selected 28 days prior to the Sale Hearing) ability to provide adequate assurance of performance of such executory contracts or unexpired leases.

(ii)     Any counterparty to a Contract shall file and serve on the Objection Recipients any objections to (a) the proposed assumption, assignment and sale of its Contract to the Winning Bidder (and must state in its objection, with specificity, the legal and factual basis of its objection) and (b) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), **no later than February 25, 2014 at 4:00 p.m. (prevailing Eastern Time)**; provided, however, that to the extent the Winning Bidder is an entity other than the Stalking Horse Bidder, any supplemental or further objections to the assumption, assignment and sale of a Contract to the Winning Bidder by a counterparty to such Contract, based solely on the Winning Bidder(s)' and/or Backup Bidder(s)' adequate assurance of future performance under any such Purchased Contract shall be filed no later than the Sale Hearing; provided further that the deadline to object to an Amended Notice of Assumption, Assignment and Sale shall be no earlier than seven (7) days after the date of service of such Amended Notice of Assumption, Assignment and Sale. If no objection is timely filed and served, (x) the counterparty to a Contract shall be deemed to have irrevocably consented to the assumption, assignment and sale of the Contract to the Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, and (y) the Cure Amount set forth in the Notice of Assumption, Assignment and Sale (or Amended Notice of Assumption, Assignment and Sale) shall be controlling, notwithstanding anything to the contrary in any Contract, any other document or applicable law, and the counterparty to the Contract shall be deemed to have irrevocably consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them.

(iii)    If the Winning Bidder or the Back-Up Bidder at the Auction is not the Stalking Horse Bidder (or there is no Stalking Horse Bidder), then within one (1) day after the Auction, the Debtors shall (i) file and serve on each counterparty to the Contracts, a supplemental Notice of Assumption, Assignment and Sale identifying the Winning Bidder and Back-Up Bidder (if applicable) and providing information regarding the Winning Bidder's and Back-Up Bidder's (if applicable) adequate assurance and (ii) publish such supplemental Notice of Assumption, Assignment and Sale on the Website.

36. Pursuant to section 365 of the Bankruptcy Code, a debtor in possession may "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and by rejecting those that do not. Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted); COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008). Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(f)(2).

37. In the present case, the Debtors' assumption, assignment and sale of the Assigned Contracts to the Winning Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Purchase Agreement will provide significant benefits to the Debtors' estates. Because the Debtors cannot obtain the benefits of any Purchase Agreement without the assumption, assignment and sale of the Assigned Contracts, the assumption, assignment and sale of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

38. The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the proposed assumption. In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola, 248 F.3d at 120 n. 10); see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit).

39. Among other ways, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid); see also In re Vitanza, Case No. No. 98-19611DWS, 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

40.     As set forth herein, the Debtors contemplate that the Purchaser will be able to provide adequate assurance of future performance in connection with any assigned and sold executory contracts and leases because the Purchaser must submit evidence to demonstrate it has the financial wherewithal and ability to consummate the transactions contemplated in connection with the sale of the Purchased Assets, including future performance of any contracts or leases. Moreover, at the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption, assignment and sale of contracts or leases proposed to be assigned and sold to the Purchaser will be satisfied.

41.     Accordingly, the Debtors submit that the assumption, assignment and sale of the assigned contracts as set forth herein should be approved.

**Sale of Purchased Assets Under Section 363 of the Bankruptcy Code Is Warranted**

42.     The Debtors request that the Court approve the sale of the Purchased Assets to the Purchaser pursuant to the terms of the Asset Purchase Agreement with the Purchaser. Ample authority exists for the approval of the proposed sale of the Purchased Assets to the Purchaser. Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and interests, provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

Although section 363 of the Bankruptcy Code does not specify when it is appropriate for a court

to authorize the use, sale, or lease of property of the estate, bankruptcy courts have authorized

the sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.

Dura Automotive, 2007 Bankr. LEXIS 2764 at *258, citing Myers v. Martin (In re Martin), 91

F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec.  Holders v. Lionel Corp. (In re Lionel

Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts  Dairies of Penn., Inc., 788 F.2d 143

(3d Cir. 1986) (implicitly adopting the "sound business judgment" test of In re Lionel Corp. and

requiring good faith); In re Delaware and Hudson Ry.  Co., 124 B.R. 169 (D. Del. 1991)

(concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts

Dairies decision); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999)

(same); In re Trans World Airlines, Inc., Case No. 01-00056 (PJW), 2001 WL 1820326, at *10

(Bankr. D. Del. Apr. 2, 2001).

43.     In the circumstances of valid business justifications, applicable principles of law

attach to a debtor's decision a strong presumption "that in making a business decision[,] the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company." Official Comm. of Sub. Bondholders

v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding

that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially

where the debtor is a Delaware corporation) (quotations omitted).  In this District, once a court is

satisfied that there is a sound business justification for the proposed sale, the court must then

determine whether (i) the debtor in possession has provided the interested parties with adequate

and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is

proceeding in good faith. <u>Delaware and Hudson Ry</u>., 124 B.R. at 166; <u>In re Decora Indus., Inc.</u>, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

44.     The Debtors submit that the sale of the Purchased Assets early in these chapter 11 cases is based upon the sound business judgment of the Debtors.  To maintain the Debtors as a going concern and to prevent any deterioration of the Debtors' businesses, it is necessary for the Debtors to emerge from chapter 11 quickly.  To that end, the Debtors, in consultation with their professional advisors, determined that a sale of substantially all the Debtors' assets was the best course of action to prevent deterioration to the value of the Debtors' estates.  The sale contemplated herein allows the Debtors' businesses to continue as a going concern, which will result in the continued employment of many of the Debtors' employees.  To facilitate a sale of the Debtors' assets and provide the Debtors' with sufficient liquidity to operate during these chapter 11 cases and continue normal business operations during this critical time, the First Lien Lenders agreed to provide the Debtors' with debtor in possession financing.  Furthermore, the Sale will benefit the estates because it will enable the Debtors to have the market value of their estates, which will provide maximum value on account of their assets, and protracted chapter 11 cases will only diminish the value of the Debtors' estates.

45.     In similar situations, this Court has approved the sale of all or substantially all of a debtor's assets within the first three months of a chapter 11 case. <u>See, e.g.</u>, <u>In re Magic Brands, LLC</u>, Case No. 10-11310 (BLS) (Bankr. D. Del. June 24, 2010); <u>In re Spheris, Inc.</u>, Case No. 10-10352 (KG) (Bankr. D. Del. Apr. 15, 2010); <u>In re Anchor Blue Retail Group, Inc.</u>, Case No. 09-11770 (PJW) (Bankr. D. Del. Jun. 30, 2009).

46.     Moreover, as stated herein, the Debtors will provide notice of the sale of the Purchased Assets to interested parties and the Debtors believe that the aforementioned notice

procedures are reasonable and adequate under the circumstances. At the Sale Hearing, the Debtors will provide evidence that the sale price for the Purchased Assets is fair and reasonable as being the highest or best offer received for the Purchased Assets after such assets are actively marketed by the Debtors' financial advisors.

47.     Accordingly, the Debtors request that the Court approve the proposed sale of the Purchased Assets to the Purchaser.

**Sale of Purchased Assets Free and Clear of Liens, Claims and Interests**

48.     In the interest of attracting the best offers, the Debtors request that the sale of the Purchased Assets to the Purchaser be free and clear of any and all liens, claims, and interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, and interests paid to the secured creditors and/or attaching to the proceeds of the sale of the Purchased Assets.

49.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims, and interests if one of the following conditions is satisfied:

> (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased

Assets "free and clear" of liens, claims and interests. Dura Automotive, 2007 Bankr. LEXIS 2764 at *262-63; In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002).

50.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See The Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ P 'ship v. Va. Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[7]

---

[7] Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens poses no impediment to such a sale, as such authority is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

51.     The purpose of an order purporting to authorize the transfer of the Purchased Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Winning Bidder.  Under section 363(f) of the Bankruptcy Code, the Winning Bidder is entitled to know that the Purchased Assets are not infected with latent claims that will be asserted against the Winning Bidder after the proposed transaction is completed.

52.     Accordingly, the Debtors submit that the sale satisfies one or more of the factors in section 363(f) of the Bankruptcy Code.  The liens on the Purchased Assets will attach to the proceeds of the Sale and, in the instance that the proceeds are less than the liens, it is market proof that the holders of the liens are under-secured.  Thus, a sale of the Purchased Assets to the Purchaser, free and clear of all liens, claims, and interests, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

## The Purchaser Should Be Afforded All Protections
## Under Section 363(m) as a Good Faith Purchaser

53.     The Debtors further request that the Purchaser be entitled to all protections in section 363(m) of the Bankruptcy Code as a good faith purchaser of the Purchased Assets. Section 363(m) protects the sale of a debtor's property to a good faith purchaser, notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section 363(m) provides,

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the United States Court of Appeals for the Third Circuit has noted that the phrase "encompasses one who

purchases in 'good faith' and 'for value.'" <u>Abbotts Dairies</u>, 788 F.2d at 147. Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" <u>Id</u>. (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978).

54.     By the time of execution of the Asset Purchase Agreement, the Debtors and the Winning Bidder will have engaged in thorough arms'-length negotiations over the terms of the Asset Purchase Agreement. In addition, the Winning Bidder will have complied with the terms and conditions of the Bidding Procedures Order.

55.     The Debtors will ensure that the Asset Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code and, as a result, the Winning Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

56.     Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Asset Purchase Agreement reached with the Winning Bidder was at arms-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### The Stalking Horse Protections Should Be Approved

57.     The Debtors seek approval of a "break-up fee" of not more than 3% of the total purchase price offered and expense reimbursement of reasonable out of pocket expenses as bidding protections for a Stalking Horse Purchaser. Approval of the Break-Up Fee and other forms of bidding protections in connection with the sale of significant assets pursuant to section

363 of the Bankruptcy Code has become an established practice in chapter 11 cases, because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

58.     Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth  Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Case Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1991) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); see also In re Integrated Resources, 147 B.R. 650, 65758 (S.D.N.Y. 1992).

59.     However, in In re O'Brien Envt'l Energy, Inc., 181 F. 3d 527, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy sale context.  Accordingly, when a stalking horse bidder seeks approval of its fees, bidding incentives must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets.  Id. at 533; see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010).

60.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, break-up fees may be necessary to preserve the value of the estate

if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, if the availability of a break-up fee were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

61.     Because the Break-Up Fee provides the types of benefits to the Debtors' estates as identified by the Third Circuit in O'Brien, it should be approved. First, all negotiations between the Debtors and potential purchasers have been, and will be, conducted on a good faith, arm's-length basis. Second, based on the Debtors' extensive and ongoing solicitation process, the Debtors have determined that the Break-Up Fee is necessary to attract and retain a Stalking Horse Purchaser. The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse. Therefore, absent authorization of the payment of the Break-Up Fee, the Debtors may lose the opportunity to obtain the highest and best available offer for their assets and the downside protection afforded by Stalking Horse Purchase Agreement.

62.     Moreover, the promise of a Break-Up Fee will incentivize parties to submit serious Qualified Bids. The Break-Up Fee will provide the incentive needed to induce a bidder to increase its bid prior to the Auction. Further, a Stalking Horse Purchaser (with a signed Asset Purchase Agreement) will establish the structure of the Sale transaction, the form of the Asset Purchase Agreement, and a minimum bid for other bidders, further ensuring that during the Auction the Debtors receive the highest or best bid possible for the Purchased Assets. Accordingly, the higher the Stalking Horse Purchaser bid, the higher the floor for bidding at the

Auction. Thus, even if the Stalking Horse Purchaser is offered the Break-Up Fee, and is ultimately not the Winning Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Property will be sold will reflect its true worth.

63. Accordingly, to achieve the optimal Stalking Horse Purchaser bid, the Debtors must have authority to offer a Break-Up Fee.

64. This Court has approved protections similar to the Break-Up Fee as reasonable and consistent with the type and range of bidding protection typically approved. See, e.g., In re Magic Brands, LLC, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); In re Spheris, Inc., Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 23, 2010) (authorizing stalking horse expense reimbursement); In re Anchor Blue Retail Group, Inc., Case No. 09-11770 (PJW) (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to $1,000,000.00); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Mar. 12, 2008) (authorizing reimbursement of expenses for initial bidder in store closing sales auction); In re Earthshell Corp., Case No. 07-10086 (KG) (Bankr. D. Del. Feb. 12, 2007) (authorizing stalking horse expense reimbursement); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination payment); In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) (authorizing expense reimbursement); In re Radnor Holdings, Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted).

65.     The proposed bid protections are fair and reasonable in amount, and well within market.  Payment of the bid protections is not likely to diminish the value of the Debtors' estates. The Debtors will incur the obligation to pay the Break-Up Fee only (a) following an agreement to sell the Purchased Assets in an alternative transaction with an alternative bidder for a purchase price that, because of the initial overbid provisions of the Bid Procedures, will necessarily <u>exceed</u> the full sum of the purchase price provided for in the Stalking Horse Purchase Agreement and the Break-Up Fee by at least $100,000 or (b) as otherwise set forth in the Stalking Horse Purchase Agreement.  In light of the benefit to the Debtors' estates to be realized by having a Stalking Horse Purchase Agreement that will enable the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Break-Up Fee.

66.     The Debtors have demonstrated a sound business justification for authorizing the Break-Up Fee and its clear necessity and benefit to these estates.  Thus, the Debtors request that this Court approve and authorize the payment of these bid protections pursuant to the terms and conditions of the Asset Purchase Agreement

### The Sale Complies with Section 363(b)(1) of the Bankruptcy Code

67.     Pursuant to section 363(b)(1) of the Bankruptcy Code, the Debtors may not sell personally identifiable information if the Debtors, in connection with offering their products or services, have a policy prohibiting the transfer of such information and if such policy is in effect on the date of the commencement of the case, unless:

> a. such sale is consistent with such policy, or
>
> b. after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease —

(i) giving due consideration to the facts, circumstances and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1). As of the Petition Date, the Debtors' privacy policy provided, among other things, that:

> "[the Debtors] may acquire other businesses, and another company may acquire [the Debtors] or substantially all of [their] assets such as through a merger, consolidation, acquisition, or asset purchase. If that occurs, the information we collect may be one of the assets examined or transferred as part of the transaction. We will not permit another business to examine the information we have collected without a confidentiality agreement. We will not transfer the information we have collected unless the acquirer of all or substantially all of [the Debtors'] assets agrees to provide the same or substantially similar privacy protections as those established by this privacy policy. So long as the acquirer of all or substantially all of [the Debtors'] assets agrees to be bound by the same or substantially similar privacy protections as those established by this privacy policy, we may transfer such information without any restrictions or conditions of any kind."

In addition, the Asset Purchase Agreement provides that the Purchaser shall honor and observe any and all policies of the Debtors in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of section 363(b)(1)(A) of the Bankruptcy Code.

68.     As a result, the Debtors submit that pursuant to its privacy policy in existence on the Petition Date, they may transfer their personally identifiable information to a Purchaser which agrees to the foregoing provision in the Asset Purchase Agreement without the need for a consumer privacy ombudsman to be appointed.

## The Court Should Waive or Reduce the Periods
## Required by Bankruptcy Rules 6004(h) and 6006(d)

69.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

70.     To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Purchased Assets, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale of the Purchased Assets or to the assignment and sale of any contract is filed, reduce the stay period to the minimum amount of time reasonably required by the objecting party to file its appeal; provided, however, that, the Stalking Horse Purchaser or any other Winning Bidder is under no obligation to close absent a final order of the Court.

## NOTICE

71.     Notice of this Motion has been provided to the following parties: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the First Lien Agent; (vi) counsel to the Second Lien Agent; (vii) those creditors

holding the thirty-five (35) largest unsecured claims against the Debtors' estates (on a consolidated basis); and (viii) all parties that, as of the filing of this Motion, have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PREVIOUS REQUEST**

72.     No previous request for the relief sought herein has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE the Debtors respectfully request entry of the Bid Procedures Order and the Sale Order, granting the relief requested herein, and such other and further relief as the Court may deem just and appropriate.

Dated: December 15, 2013          Young Conaway Stargatt & Taylor, LLP
      Wilmington, Delaware

                                        */s/ Robert F. Poppiti, Jr.*
                                        Robert S. Brady (No. 2847)
                                        Robert F. Poppiti, Jr. (No. 5052)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone:  (302) 571-6600
                                        Facsimile:  (302) 571-1253

                                               and

                                        Adam H. Friedman
                                        Jordanna L. Nadritch
                                        Jonathan T. Koevary
                                        Olshan Frome Wolosky LLP
                                        Park Avenue Tower
                                        65 East 55th Street
                                        New York, New York 10022
                                        Telephone:  (212) 451-2300
                                        Facsimile:  (212) 451-2222

                                        *Proposed Counsel to the Debtors*